## COMMONWEALTH *vs.* PHILLIPE MERCADO.

Essex. October 10, 2008. - November 26, 2008.

Present: MARSHALL, C.J., GREANEY, COWIN, CORDY, & BOTSFORD, JJ.

*Practice, Criminal,* Assistance of counsel, Instructions to jury, New trial, Capital case. *Constitutional Law,* Assistance of counsel. *Mental Impairment. Homicide.*

In a murder case, a Superior Court judge acted within her discretion in deny-ing the defendant's motion for a new trial alleging ineffective assistance of counsel, where it was not manifestly unreasonable for trial counsel to introduce, or allow the Commonwealth to introduce, evidence of the defendant's violent past as part of an over-all defense strategy to link the defendant's mental illness to his violent acts, including the stabbing that resulted in the victim's death [666-670]; moreover, an evidentiary hearing on the motion was unnecessary, as the motion judge, who was also the trial judge, recalled the defendant's strategy well [672-673].

At the trial of an indictment charging murder in the first degree, the judge's instruction on provocation did not create a substantial likelihood of a miscarriage of justice, where, aside from the fact that the instruction given was the one requested by the defendant and identical to that contained in the Model Jury Instructions on Homicide (1999), the evidence in the case did not warrant such an instruction, and where, in any event, the instruc-tion adequately distinguished between mere words, which cannot constitute reasonable provocation, and the conveyance of shocking information, which can do so. [670-672]

INDICTMENT found and returned in the Superior Court Depart-ment on September 5, 2001.

The case was tried before *Leila R. Kern,* J., and motions for a new trial, filed on February 16, 2007, and to reduce the verdict, filed on April 12, 2007, were considered by her.

*Leslie W. O'Brien* for the defendant.

*Catherine Langevin Semel,* Assistant District Attorney, for the Commonwealth.

COWIN, J. A Superior Court jury convicted the defendant, Phillipe Mercado, of murder in the first degree on a theory of

deliberate premeditation.[1] The victim was his wife. The defendant did not contest that he killed his wife; his defenses were lack of criminal responsibility[2] and provocation arising from his wife's infidelity. Represented by new counsel, he appeals from his conviction, from the denial of his motion for a new trial, and from the denial of his motion to reduce the verdict. He claims that his trial counsel was ineffective for failing to object to the Commonwealth's introduction of evidence of his violent past and for counsel's introducing such evidence himself; that the judge's instruction regarding provocation erroneously defined heat of passion; and that the trial judge erred by denying his motion for a new trial without holding an evidentiary hearing. The defendant also requests that we exercise our extraordinary power pursuant to G. L. c. 278, § 33E, to reduce the verdict to manslaughter. We affirm the convictions and the orders denying the defendant's motions for a new trial and to reduce the verdict, and we decline to exercise our power under G. L. c. 278, § 33E.

*Facts and background.* We summarize the facts the jury could have found, reserving further details for discussion in conjunction with the issues raised. In July, 2001, the defendant and his wife were having marital difficulties. At various times, his wife had told the defendant that she was seeing another man, and the defendant suspected her of unfaithfulness. On July 30, 2001, the defendant found his wife's car in a local mall parking lot at a time when her car should have been in the parking lot at the hospital where she worked. The defendant, who had a set of keys to the car, unlocked the vehicle and sat inside it, waiting for his wife to return. After two hours, she arrived in the company of an unknown man. The two kissed and, when they came upon the defendant, left the parking lot without speaking to him. The defendant's wife telephoned his probation office. A probation officer responded to the scene, and the defendant was told to leave

---

[1]The defendant was also indicted on a charge of violating a G. L. c. 209A order. This charge was nol prossed.

[2]We have adopted the Model Penal Code test for determining criminal responsibility. "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967).

the car, to stay away from his wife, and to report to probation in the morning.

The defendant (who testified at trial) returned to the apartment where he and his wife lived with their children. Shortly thereafter, his wife returned and the two of them argued. His wife told the defendant that she had been seeing another man and that she wanted the defendant to leave the home.

The defendant's wife then drove around the corner to the apartment of Julie Diaz, her sister-in-law, who had been caring for her three children. The defendant tried to control himself, but could not. He grabbed a kitchen knife and went to the Diaz apartment. There he stabbed his wife to death, slashing her several times in front of their children and others. He then ran to the street, broke the window of his wife's car, grabbed her purse, and scattered its contents on the street. He also superficially cut his wrist. By this time, the police had responded to a 911 call; they observed the defendant walking on the street and took him into custody.

While the defendant was treated for the cut to his wrist, he asked the emergency medical technicians (EMTs) and an accompanying police officer, "Is she dead?" He also inquired, "Can you put a bullet in my head so I can get out of this?" When the officer and the EMTs said that they could not, he responded, "I just snapped."

At the police station, the defendant made a telephone call and, speaking in Spanish, instructed the person on the other end of the telephone to go to his home immediately and retrieve specific items. (This conversation was overheard by a Spanish-speaking individual who was working nearby in the police station.) Sometime later, when a State trooper approached the defendant to interview him, the defendant asked, "How bad did I fuck up?" and inquired whether his wife were dead. When the trooper informed the defendant that his wife had died, he cried.

The trooper gave the defendant Miranda warnings and the defendant agreed to give a statement. He related his marital problems, the events of the day of the killing, and the details of the killing itself. He stated that he had been on medication for epilepsy but had not taken it that morning. He also said that he had been on other medications previously, but that his insurance

was not covering these medications recently and so he was not taking them.[3]

According to Charles Blute, a counsellor who treated the defendant in 1999 and early 2000, the defendant complained of "extreme problems with irritation, anger management," and "controlling his temper." The defendant was diagnosed with "psychotic disorder" (meaning "he had some delusions and was hearing voices and responding to internal stimuli"), was prescribed medications by a psychiatrist, and was given weekly counselling.

Dr. Paul Spiers, an expert in clinical psychology and neuropsychology, examined the defendant for purposes of determining the defendant's criminal responsibility. As a witness for the defendant, Dr. Spiers opined that "it's certainly probable" that the defendant could not conform his behavior to the requirements of the law at the time of the killing.

Dr. Mark Schuchman, a psychiatrist, was a rebuttal witness for the Commonwealth.[4] He was a fellow at Bridgewater State Hospital who conducted a criminal responsibility evaluation on the defendant shortly after the killing. Dr. Schuchman gave the defendant the *Lamb* warnings,[5] see *Commonwealth* v. *Lamb*, 365 Mass. 265, 270 (1974), *S.C.*, 372 Mass. 17 (1977), and interviewed him for about four hours in the month following the killing. Dr. Schuchman also spent about fifty hours interviewing witnesses and reading the defendant's medical records. He opined that the defendant was able to form an intent to kill his wife and that the defendant was criminally responsible for his

---

[3]Both the defendant's and the Commonwealth's experts testified, based on the defendant's medical records, that he had previously taken medications for depression and epilepsy, as well as an antipsychotic medication. When the experts examined the defendant prior to trial, he was taking all three types of medication.

[4]For the procedure and sequence of witnesses in cases involving a defense of lack of criminal responsibility, see *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 764-769 (1977). See also *Commonwealth* v. *Harvey*, 397 Mass. 803, 808 (1986).

[5]*Commonwealth* v. *Lamb*, 365 Mass. 265, 270 (1974), *S.C.*, 372 Mass. 17 (1977), states that G. L. c. 233, § 20B, preserves a patient's right to keep privileged any communications made to a court-appointed psychiatrist, in the case of a court-ordered examination, absent a showing that the defendant was informed that the communications would not be privileged.

actions at that time. Dr. Schuchman also testified to many past acts of violence by the defendant.

The reports of both Dr. Spiers and Dr. Schuchman were introduced in evidence without objection. In addition, the defendant's medical records were introduced in evidence by the defendant subject to the limitation that the jury were not to consider the records substantively, but only as a basis for the experts' opinions. See note 9, *infra*.

*Discussion.* The defendant claims that his trial counsel was ineffective for permitting the introduction of evidence of the defendant's prior violent acts. The evidence the defendant claims should have been excluded are statements by his probation officer, Danielle Sullivan; the report of the Commonwealth's expert, Dr. Schuchman; and portions of the defendant's medical records. Most of this evidence was introduced by the Commonwealth; the medical records were introduced by the defendant. For reasons that will be apparent, whether the Commonwealth or the defendant introduced the evidence has no bearing on the ineffective assistance of counsel claim.

The defendant alleged ineffectiveness of counsel by filing a motion for a new trial. The judge denied the motion without a hearing.[6] In reviewing the denial of a motion for a new trial, we determine whether a motion judge abused her discretion or committed any other error of law, and give special deference to the action of a motion judge who, as here, was also the trial judge. *Commonwealth* v. *Espada*, 450 Mass. 687, 697 (2008).

Because the defendant has been convicted of murder in the first degree, we consider his claim of ineffectiveness of counsel to determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than the constitutional standard for determining the ineffectiveness of counsel. *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). Thus, we consider whether there was error during the course of the trial and, if so, whether the error was "likely to have influenced the jury's conclusion." *Id.* at 682. Under this more favorable standard of review, we consider a defendant's claim even if the action by

---

[6]The denial of the motion without a hearing is the basis for another of the defendant's claims. See *infra*.

trial counsel does not "constitute conduct falling 'measurably below' that of 'an ordinary fallible lawyer.' " *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 517 (1992), quoting *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). A strategic decision by an attorney, however, amounts to ineffective assistance "only if it was manifestly unreasonable when made." *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999), quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998).

The defendant's claim of ineffective assistance of counsel is based on defense counsel's failure to keep from the jury evidence of the defendant's past violent acts and defense counsel's introduction of such evidence himself. However, merely because some or all of this evidence could have been excluded is not sufficient by itself to establish that trial counsel was ineffective. The question is not whether defense counsel could have succeeded in excluding the evidence, but whether he *wanted* the evidence excluded. If defense counsel determined that the evidence should be admitted for some reason, and if that were not a manifestly unreasonable strategy, there is no ineffective assistance of counsel.

The record makes clear that it was a well-considered defense strategy to present the defendant as a man with mental problems *and* a history of assaultive behavior associated with those mental problems that predated his assault on the victim in this case. The actions of counsel of which the defendant now complains were in accord with that strategy. The defendant had killed his wife in front of several witnesses. His strongest defense was a claim of lack of criminal responsibility. The defendant had a substantiated and lengthy history of treatment for mental health issues, in particular psychotic disorder and depression; however, he had lived with these conditions for seventeen years and had never exhibited this degree of violence before. Portraying the defendant as a violent person who could not control his antisocial behavior might succeed in persuading the jurors that the defendant's criminal responsibility was not established beyond a reasonable doubt. This was not a manifestly unreasonable strategy and defense counsel pursued it throughout the trial.

Defense counsel's opening statement referred to the defendant's "several different violent outbreaks" while he was hospitalized in

1993 and alerted the jury that the defendant had had problems with homicidal and suicidal ideations[7] for years before this incident. "He was a time bomb . . . ." The opening statement also mentioned that the defendant was on probation and attending both a batterer's program and an anger management program.

In keeping with his strategy, counsel did not object when the defendant's probation officer testified that the defendant was attending a "[b]atterer's [i]ntervention [p]rogram," and described this program as "designed for men who have exhibited a pattern of assaultive behaviors, coercive behaviors . . . to teach [them how to] react[] to situations . . . without using abusive or violent or coercive behavior." Similarly, there was no objection to testimony that the defendant was on probation.[8] Clearly, it was defense counsel's intent to link the defendant's mental illness to his violent acts.

Consistent with this strategy, defense counsel introduced the defendant's medical records pertaining to his mental health treatment, including the 1993 hospitalization records. The latter records were admitted as hospital records pursuant to G. L. c. 233, § 79G.[9] They documented the defendant's troubled past, including violent tendencies that long predated the instant attack. In addition, these medical records detailed the contrast between the defendant's conduct and mental status while on medication (relatively stable, congenial and cooperative) and his state when he was off his medication (assaultive, delusional, with suicidal and homicidal ideation). Because the defendant testified that he was off his medication on the day of the killing, this was an important distinction for the defense to make.

---

[7]Ideation is the formation of ideas or thoughts. Stedman's Medical Dictionary 944 (28th ed. 2006).

[8]The fact that the defendant was on probation was part of the sequence of events leading up to the killing and was inevitably a part of the trial. Thus, it is unlikely that an objection would have been successful. The offense for which the defendant was on probation was not specified. In addition, in describing some of the treatments he received for mental health issues, the defendant himself testified that he had been incarcerated.

[9]There was no redaction of these records to limit them to medical history and treatment. See G. L. c. 233, § 79G. See also *Commonwealth* v. *Francis*, 450 Mass. 132, 138-139 (2007). The judge instructed the jury not to consider these records substantively, but only as a basis for the experts' opinions. It is not clear to us why, if the records were admitted pursuant to G. L. c. 233, § 79G, the jury were so instructed.

The report of Dr. Schuchman similarly contains much evidence of the defendant's acting out that was not described by Dr. Schuchman's testimony: his arrests for several minor criminal offenses[10]; his selling of drugs and stealing of cars as an adolescent; his more recent arrest for violation of a restraining order; and the defendant's statement that "when [he] fight[s] . . . [he] like[s] to see blood."

The defendant would have us view each of trial counsel's objections or failures to object as a separate event indicating that defense counsel did not utilize the rules of evidence to his advantage. But the evidentiary judgment calls must be viewed in the context of the over-all defense strategy: an attempt to link the defendant's past violence with his mental illness to support the claim that the stabbing of his wife was similarly linked to his mental illness when he was off his medications. Had the jury been presented with a mental history that excluded the defendant's violence, the question would arise why the defendant, suffering from these mental problems for seventeen years, had not been violent before. We agree with the trial judge's statement that "[i]t was a sound strategy to try to substantiate defendant's mental illness and its association with aggressive acts as dating back many years before he stabbed his wife."[11,12]

It was not unreasonable to conclude that a simple lack of

---

[10]These cases were for assault and battery on a household member, disturbing the peace, malicious destruction of property over $250, threatening, assault with a dangerous weapon (a baseball bat), and being a disorderly person.

[11]Additional indication that defense counsel's strategy was purposeful is that counsel was not unaware of the possibility of excluding evidence of prior bad acts. Indeed, he filed a motion in limine to exclude prior bad acts, which was allowed prior to trial. Unfortunately, nothing in the record identifies the precise bad acts this motion encompassed. The motion itself does not state the acts to which it refers, and the motion was discussed in an unrecorded conference. We are impeded in our analysis of the case by the absence of the discussion that occurred in the unrecorded conference, and we emphasize again the importance of recording all conferences. See *Commonwealth* v. *Serino*, 436 Mass. 408, 412 n.2 (2002); *Commonwealth* v. *Fanelli*, 412 Mass. 497, 501 (1992).

[12]The record contains an unsigned affidavit of trial counsel and a signed affidavit from appellate counsel regarding the latter's conversation with trial counsel. Appellate counsel's signed affidavit recites that she mailed the draft affidavit to trial counsel but did not receive a response. Although we do not rely on an unsigned affidavit, the document suggests an additional possible reason for defense counsel's failure to object to the admission of the report of

criminal responsibility defense, a "battle of the experts," would not succeed without an attempt to connect that mental illness with past violent behavior. The problem for the defendant in this case was the strength of the evidence against him, not the inadequacy of his attorney. See *Commonwealth* v. *Satterfield,* 373 Mass. 109, 111 (1977). A judgment call made by counsel that he needed to buttress expert opinion with an actual history of violence showing that the defendant could not control his actions, especially when off his medications, was not manifestly unreasonable.

Counsel frequently must weigh the benefits and risks of certain pieces of evidence. See *Commonwealth* v. *Carmona,* 428 Mass. 268, 275-276 & n.7 (1998) (no substantial risk of miscarriage of justice where defense counsel's tactical choice not to object to hearsay testimony provided both benefit and risk to defendant). We agree with the assessment of the trial judge who found that counsel appeared to have "weighed the potential risks and benefits of introducing, or allowing the Commonwealth to introduce, certain pieces of evidence."[13]

On appeal, the defendant contends that the instruction on

Dr. Schuchman: that he wanted the report of his expert, Dr. Spiers, to remain in evidence and he feared that if he objected to Dr. Schuchman's report both reports might be struck.

[13]In addition, much of Dr. Schuchman's report (to which the defendant now objects) is merely cumulative of the testimony of the various witnesses. For example, the defendant's counsellor, Blute, testified that the defendant had "trouble controlling his temper." "He had come in complaining of having extreme problems with irritation, anger management . . . ." The defendant's expert on criminal responsibility, Dr. Spiers, testified that the defendant had described to treating doctors "what we would call an intermittent explosive disorder, which is where someone may become overwhelmed emotionally and they lose control of their temper." Relying on the defendant's medical records, Dr. Spiers recounted that back in 1993, the defendant stated, "When I'm mad, I'm blind and I could do anything. I'm going to explode soon." Dr. Spiers also testified that the defendant had had an outburst at the jail in which he "apparently attacked another inmate."

Dr. Schuchman, the Commonwealth's rebuttal psychiatrist, testified to much of the material contained in his own report and in the medical records. For example, Dr. Schuchman mentioned the defendant's general homicidal ideations several times. Dr. Schuchman's report, which was admitted in evidence, specifically referred to the defendant's homicidal ideations toward two students at his high school. Dr. Schuchman also described the defendant's prior assaultive behavior toward his high school principal, toward his brother, and toward others at the Bridgewater State Hospital. Dr. Schuchman stated

provocation was erroneous. A killing is manslaughter if there is "provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool." *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984). The general rule is that words alone are not sufficient provocation to reduce murder to manslaughter, although we have recognized an exception to this rule where the words convey inflammatory information to the defendant. See *Commonwealth* v. *Anderson*, 396 Mass. 306, 314 (1985); *Commonwealth* v. *Bermudez*, 370 Mass. 438, 440-442 (1976). "However, this is a very limited exception" applicable only "where the statements constitute a 'peculiarly immediate and intense offense to [one's] sensitivities.' " *Commonwealth* v. *Benjamin*, 430 Mass. 673, 680 (2000), quoting *Commonwealth* v. *Bermudez, supra* at 441-442. A sudden oral revelation of infidelity may be sufficient provocation to reduce murder to manslaughter. See *Commonwealth* v. *Schnopps, supra* at 181-182. But the revelation alleged to have precipitated the homicide must be a "sudden discovery" to justify such a reduction. *Commonwealth* v. *Andrade*, 422 Mass. 236, 237-238 (1996).

The defendant claims the instruction given does not adequately distinguish between "mere words," which cannot constitute "reasonable provocation," and the conveyance of shocking information, which can do so. The judge's instruction was in the specific language requested by the defendant. Accordingly, we consider whether the instruction could have created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Ruddock*, 428 Mass. 288, 291-292 (1998).

The challenged instruction is as follows:

> "Mere words, no matter how insulting or abusive, standing alone do not constitute reasonable provocation; however, the existence of sufficient provocation is not foreclosed because a defendant learns of a fact from a statement rather

that in 1993 the defendant had said that he "need[ed] help to keep from hurting someone." Likewise, the doctor testified that the defendant had been involved in criminal activity, had destroyed property, and had tested positive for opiates on the day of the incident.

than from a personal observation. If the information conveyed is of the nature to cause a reasonable person to lose his or her self control and did actually cause the defendant to do so, then a statement is sufficient."

The instruction given is not only the one requested by the defendant; it is identical to that contained in the Model Jury Instructions on Homicide 28-29 (1999). Nevertheless, the defendant contends that the instruction given did not sufficiently set forth the distinction between language that is merely abusive and that which conveys information that could arouse the heat of passion in a reasonable person. He claims that his wife's informing him that she had been seeing another man for a year and had had sex with him that same day; that he was a better lover than the defendant; and that she loved the other man, was such information. Aside from the fact that the instruction given was the one requested by the defendant, the evidence in this case did not warrant such an instruction. There was no "sudden discovery" that is the prerequisite for an instruction on reasonable provocation. See *Commonwealth* v. *Andrade, supra* at 237-238. The defendant had suspected his wife of having an affair for some time; he had seen her kiss another man earlier that day; and she had told him before that she was seeing other men. In addition, by his own admission, there was a "cooling off" period which negates the requisite "sudden discovery." See *Commonwealth* v. *Andrade*, supra at 237-238; *Commonwealth* v. *Espada*, 450 Mass. 687, 695 (2008). After the recital of his wife's infidelity, the defendant went to his kitchen, obtained a knife, and walked to his sister-in-law's apartment.

In any event, the instruction given explained to the jury the distinction between mere words, which "no matter how insulting or abusive, standing alone do not constitute reasonable provocation," and statements that convey information "of the nature to cause a reasonable person to lose his or her self control and did actually cause the defendant to do so, [which are] sufficient [to constitute reasonable provocation]." There was no error.

The defendant's final claim is that the judge erred by not holding an evidentiary hearing on his motion for a new trial. Whether to hold a hearing on a motion for a new trial is within the judge's discretion, and the judge may rule on the motion for new trial without a hearing if "no substantial issue is raised by

the motion or affidavits." *Commonwealth* v. *Wallis*, 440 Mass. 589, 596 (2003), citing Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001). When the motion judge was also the trial judge, she may use her "knowledge and evaluation of the evidence at trial in determining whether to decide the motion for a new trial without an evidentiary hearing." *Id.* We give substantial deference to a judge's conclusion in this regard. *Id.*

The issue raised by the motion for a new trial was the reasonableness of the defense strategy and whether defense counsel should have sought to prevent the admission of certain evidence. Because the judge recalled the defendant's strategy well, a hearing on the motion was not necessary. *Id.* She stated that she specifically remembered the pretrial conference in which the defendant's motion to exclude evidence of prior bad acts was discussed. The judge "recall[ed]" that this motion "did not include the conduct elicited during the probation officer's testimony nor . . . the experts' reports, [and that this] was . . . a strategic decision on trial counsel's part to allow (and during cross-examination actually elicit) the testimony now complained of as it fit into trial counsel's reliance on a defense of lack of criminal responsibility."[14]

Obviously, the judge had a clear memory of the events of the trial and the facts underlying the issue raised by the motion for a new trial. In addition, as discussed previously, the defense strategy is clear from reviewing the record. The judge's memory that the decisions now challenged were strategic choices to support a defense of lack of criminal responsibility is supported by the trial record. An evidentiary hearing to supplement the judge's memory was not necessary.

We have considered the entire record pursuant to our obligation under G. L. c. 278, § 33E. There is no reason to exercise our authority to reduce the jury's verdict on the murder charge or to order a new trial.

> *Judgment affirmed.*
>
> *Orders denying motions for a new trial and for a reduction of verdict affirmed.*

[14]Again, a record of the pretrial conference would have been extremely helpful.