COMMONWEALTH vs. BRIAN KEITH CAVITT.

Hampden. May 6, 2011. - September 21, 2011.

Present: IRELAND, C.J., SPINA, BOTSFORD, GANTS, & DUFFLY, JJ.

*Practice, Criminal,* Motion to suppress, Assistance of counsel, New trial, Capital case. *Probable Cause. Search and Seizure,* Probable cause, Affidavit. *Constitutional Law,* Assistance of counsel, Identification. *Evidence,* Informer, Photograph, Identification, Relevancy and materiality. *Identification. Deoxyribonucleic Acid.*

A Superior Court judge properly denied a criminal defendant's motion for a new trial, in which the defendant alleged that trial counsel had failed to pursue suppression of a pair of sneakers seized by police during a search of the apartment where the defendant had been staying, where the seizure of the sneakers did not exceed the scope of the search warrant [624-628]; further, taken as a whole and read in a commonsense manner, the affidavit in support of the search warrant adequately demonstrated the veracity of the citizen informant and thus established probable cause for the issuance of the warrant [628-630].

A Superior Court judge properly denied a criminal defendant's motion to suppress a photographic identification made by a thirteen year old witness, where the defendant failed to meet his burden of showing by a preponderance of the evidence that the identification was the product of unnecessarily suggestive police procedures that were conducive to a mistaken identification. [631-633]

In the circumstances of a murder trial, the erroneous introduction in evidence of inconclusive (and therefore irrelevant) deoxyribonucleic acid evidence did not create a substantial likelihood of a miscarriage of justice, where no conclusions could be drawn from the evidence as to whether the defendant had any connection to the item tested. [633-636]

INDICTMENTS found and returned in the Superior Court Department on June 30, 2006.

Pretrial motions to suppress evidence were heard by *Daniel A. Ford,* J.; the cases were tried before *Judd J. Carhart,* J., and a motion for a new trial, filed on December 18, 2009, was heard by him.

*Jeffrey L. Baler* for the defendant.

*Katherine E. McMahon,* Assistant District Attorney, for the Commonwealth.

SPINA, J. On the morning of May 5, 2006, a Western Union office located inside a Big Y supermarket in Springfield was robbed, and shortly thereafter, fire officials discovered the dead bodies of Milagros Rosario and Edelmira Miranda inside their apartment at a nearby housing complex. A grand jury indicted the defendant on two indictments charging murder, and on one indictment each charging burning of a dwelling house, armed robbery while masked, assault and battery, and carjacking. The defendant filed a motion to suppress evidence seized by the police during a search of the apartment where he had been staying, and a motion to suppress two photographic identifications. Following an evidentiary hearing, a judge in the Superior Court denied both motions. On December 11, 2007, a jury convicted the defendant of murder in the first degree on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder on both charges, and of burning of a dwelling house, armed robbery while masked, and assault and battery.[1]

Approximately two years later, after filing a timely notice of appeal, the defendant filed a motion for a new trial, alleging ineffective assistance of trial counsel based on counsel's failure to pursue the suppression of evidence. The motion judge, who was also the trial judge, denied the motion. The defendant's appeal from the denial of his new trial motion has been consolidated with his direct appeal. The defendant now raises the following claims of error: (1) the judge erred in denying his motion for a new trial where trial counsel failed to pursue suppression of a pair of sneakers, notwithstanding a lack of probable cause for the search and seizure; (2) the judge erred in denying his motion to suppress evidence where the search warrant affidavit was not supported by probable cause because the veracity of an "unknown" citizen informant was not adequately demonstrated; (3) the judge erred in denying his motion to suppress a photographic identification made by a thirteen year old witness that was the result of undue suggestion by the police; and (4) the judge erred in allowing the introduction of inconclusive deoxyribonucleic acid (DNA) evidence without the requisite explanatory statistical support. For the reasons that follow, we affirm

---

[1] At his sentencing hearing, the defendant admitted to the judge that he had killed Milagros Rosario and Edelmira Miranda because he "didn't want witnesses."

the defendant's convictions, and we decline to reduce the degree of guilt or order a new trial pursuant to our power under G. L. c. 278, § 33E.

1. *Background.* The jury could have found the following facts. We reserve other details for our discussion of specific issues.

In early May, 2006, the defendant spent approximately ten days living in the Springfield apartment of Corinne LaVoice, the on-again, off-again girl friend of the defendant's brother, Charles Latham. Soon after his arrival, the defendant mentioned to LaVoice that he wanted to rob a Western Union office, and that he wanted somebody to help him. LaVoice told the defendant that it would be a stupid thing to do, and that he would end up going to jail.

Nonetheless, on May 5, at around 8 A.M., a man wearing a gray hooded sweatshirt, later identified as the defendant, entered the Big Y supermarket on St. James Avenue in Springfield and approached Jennifer Balicki, the clerk working at the courtesy desk, where the Western Union transactions were handled. The defendant pulled out a knife and demanded "all the money." Balicki responded by giving him "a whole wad" of $20 bills and then decreasing increments of bills, roughly totaling between $2,000 and $3,000. As the defendant ran out the door with the money, Balicki yelled that she had just been robbed. John Ryan, a customer service manager of the Big Y, began to pursue the defendant on foot and subsequently was joined by Tony Bruno, another Big Y employee. Balicki told police that the bottom portion of the robber's face had been covered by a bandana, that he was a dark-skinned Hispanic or light-skinned African-American, that he was approximately twenty to twenty-five years old, and that he was wearing a gray hooded sweatshirt with what appeared to be a black shirt underneath.

During the ensuing foot chase, Ryan observed the defendant stripping off some of his clothes and throwing them into a dumpster. Once that occurred, the defendant was wearing a red T-shirt and tan pants. He dropped some of the money and stopped to pick it up, which allowed Ryan and Bruno to catch up with him. Ryan and the defendant started to wrestle, the defendant punched Ryan in the mouth, Bruno joined the fray, the defendant was able to break free, and he ran over to a vehicle being

driven by Kavin Thompson. The defendant tried forcibly to enter the vehicle, which was stopped at a red light, but he fell off when Thompson accelerated and made a right turn. The defendant's flight with the money, his efforts to get into Thompson's car, and his placement of his red T-shirt underneath a tree were observed by two youths, Xavier Seward and Antonio Vergara, who were on their way to school.

Ryan and Bruno did not continue their pursuit when the defendant ran into a nearby housing complex on Carew Street. Instead, Ryan retrieved a gray hooded sweatshirt, a pair of blue pants, and a black shirt from the dumpster, and he turned them over to the police. The day after the robbery, Ryan selected the defendant's photograph from an array of eight photographs as the person he had chased from the Big Y on May 5. Ryan also identified the defendant at trial.

On the morning of May 5, Lieutenant John Friberg, a supervisor of the arson and bomb squad with the Springfield fire department, was working in his office on Carew Street, which was adjacent to the housing complex. Shortly after 8 A.M., he heard a police dispatch regarding an incident at the nearby Big Y supermarket. Then, at approximately 8:49 A.M., Lieutenant Friberg looked out his window and noticed what appeared to be smoke coming from a building in the housing complex. Accompanied by another firefighter, he walked toward the apartment in question, and when it became obvious that there was a fire in progress, they called for assistance.

Milagros Rosario, then age sixty-nine, and Edelmira Miranda, then age sixty-seven, lived in the apartment where smoke had been observed by Lieutenant Friberg. Miranda was confined to her bed as a result of a stroke. When firefighters responded to the apartment, they discovered two bodies, later identified as Rosario and Miranda. Rosario's body was on the floor of the living room near the couch, and Miranda's body was lying across the bed in the bedroom. Dr. Loren Mednick, the medical examiner who performed the autopsies on the victims, concluded that both had died of multiple stab wounds before the fires were started, and both had sustained burn injuries to their bodies, particularly their arms, legs, and hands.

Corinne LaVoice saw the defendant in her apartment at around

10 A.M. on the morning of May 5. She saw him again that afternoon, when she observed that he had a bandage on his elbow and a burn mark on his shoulder. She also noticed that he had gotten a haircut and was wearing gold hoop earrings. The defendant "threw" fifty dollars at her and asked if he could stay longer at her apartment. When LaVoice asked him where he had gotten the money, he told her not to worry about it. LaVoice then overheard the defendant talking with Demetrice Mitchell, the boy friend of her neighbor, as they stood on the back porch of LaVoice's apartment. She heard the defendant tell Mitchell that he had "messed up" and was going to be on the news.

Shortly before the events of May 5, the defendant had informed Mitchell that he needed some money, and he asked for Mitchell's help in robbing a Western Union office. Mitchell refused and told the defendant that he was "crazy." Then, on the afternoon of May 5, the defendant telephoned Mitchell and told him to "watch the news." The defendant proceeded to meet up with Mitchell on the back porch of LaVoice's apartment and told him that he had "robbed the bitch" at the Big Y. The defendant said that he had a knife when he demanded the money from Balicki, and he told Mitchell that he had tried to get into a passing car but had fallen. The defendant further told Mitchell that he had run into a house, that the resident had tried to get him to leave, that he had stabbed the man, and that a lady had been looking at him from the bed. Finally, the defendant told Mitchell that he took off his necklace in the bathroom of the victims' apartment while he was cleaning up, and that there would be no evidence because he had burned his clothes. The defendant was arrested on May 6, 2006, at around 6 P.M. At trial, Mitchell identified the defendant as the person who had told him about the Big Y robbery and the subsequent series of events culminating in the stabbing of the victims in their apartment.

Trooper Michael Mazza, an investigator for the State fire marshal's office, determined that two separate fires had been set in the victims' apartment, one on the couch in the living room and the other on top of the bed in the bedroom. Mazza testified that the fires were intentionally set through the application of an open flame to combustible materials.

Springfield police Detective Mark Rolland, the supervisor of

crime scene services for robberies and homicides, received the clothing that Ryan had collected, recovered a knife from a dumpster, and ordered the retrieval of a red T-shirt laying next to a tree. During a search of Corinne LaVoice's apartment pursuant to a search warrant, Detective Rolland recovered, among other items, a pair of red and white sneakers. He also recovered from the victims' apartment a gold necklace that was found on the bathroom floor, a white kitchen towel that had some reddish-brown stains on it, several knives, and a pair of tan shorts that had been placed on Rosario's body.

At trial, LaVoice identified the gray hooded sweatshirt, black shirt, red T-shirt, blue pants, tan shorts, and a pair of red and white sneakers as clothing that belonged to the defendant.[2] She identified the gold necklace found in the victims' bathroom as hers, but she stated that the defendant had been wearing it around her apartment. LaVoice also testified that she owned two steak knives, was unable to find them, and had so informed the police when she went to the police station to provide information.

Matthew Dindinger, a chemist in the DNA unit of the State police crime laboratory, gave testimony regarding DNA analysis. He stated that he had received four known DNA samples in this case: one each from the defendant, LaVoice, Rosario, and Miranda. He also received thirty "question samples" for analysis and comparison with the known DNA samples. Dindinger testified that the DNA profile obtained from the gray hooded sweatshirt was a mixture of at least two individuals, and that the defendant matched the major profile in the DNA mixture.[3] Similarly, Dindinger stated that the DNA profile obtained from the red T-shirt was a mixture of at least two individuals, and that the defendant matched the major profile in the DNA mixture.[4]

---

[2] The defendant owned the gray hooded sweatshirt. Shortly before the events of May 5, he had purchased the red T-shirt, tan shorts, and red and white sneakers with money that he had received from his uncle. Charles Latham had given the defendant the black shirt. Clarese Latham had given the defendant the blue pants.

[3] Dindinger testified that the "probability of a randomly selected unrelated individual having a DNA profile matching that obtained from [the gray sweatshirt] is approximately one in 4.713 quintillion of the Caucasian population, one in 304 quadrillion of the African-American population, and one in 4.519 quintillion of the Hispanic population." The defendant is African-American.

[4] Dindinger testified that the "[p]robability of a randomly selected unrelated

With respect to the red and white sneakers, Dindinger testified that the DNA profile obtained therefrom was a mixture of at least two individuals, and that both the defendant and Miranda were included as potential contributors to the DNA mixture.[5] Dindinger testified that the DNA profile obtained from the white kitchen towel was a mixture of at least two individuals, and that the defendant matched the major profile in the DNA mixture.[6] With respect to the tan shorts, Dindinger testified that the DNA profile obtained therefrom was a mixture of at least three individuals, and that the defendant was included as a potential contributor to the DNA mixture.[7] Dindinger testified that the DNA profile obtained from the blue pants was a mixture of at least three individuals, and that the defendant was included as a potential contributor to the DNA mixture.[8] Similarly, Dindinger testified that the DNA profile obtained from the black shirt also was a mixture of at least three individuals, and that the defendant was included as a potential contributor to the DNA mixture.[9] Dindinger stated that the DNA profile obtained

individual having a DNA profile matching that obtained from [the red T-shirt] is approximately one in 4.713 quintillion of the Caucasian population, one in 304.4 quadrillion of the African-American population, and one in 4.519 quintillion of the Hispanic population."

[5] Dindinger testified that the "[p]robability of a randomly selected individual — unrelated individual having contributed DNA to this mixture [from the red and white sneakers] is approximately one in 299.8 million of the Caucasian population, one in 64.2 million of the African-American population, and one in 456.2 million of the Hispanic population." Miranda was Hispanic.

[6] Dindinger testified that the "probability of a randomly selected unrelated individual having a DNA profile for [the white kitchen towel] is approximately one in 4.713 quintillion of the Caucasian population, one in 304.4 quadrillion of the African-American population, and one in 4.519 quintillion of the Hispanic population."

[7] Dindinger testified that the "probability of [a] randomly selected unrelated individual[] having contributed DNA to this mixture [from the tan shorts] is approximately one in thirty-seven of the Caucasian population, one in twenty-five of the African-American population, and one in eighty-five of the Hispanic population."

[8] Dindinger testified that the "probability of [a] randomly selected unrelated individual having contributed DNA to this mixture [from the blue pants] is one in two of the Caucasian population, one in two of the African-American population, and one in two of the Hispanic population."

[9] Dindinger testified that the "probability of a randomly selected unrelated individual[] having contributed DNA to this mixture [from the black shirt] is approximately one in one of the Caucasian population, one in one of the African-American population, and one in one of the Hispanic population."

from the gold necklace was a mixture of at least two individuals, but the profile had yielded inconclusive results for comparison with the defendant. On cross-examination, Dindinger testified that the DNA profile obtained from the blade of a knife he was asked to examine was a mixture of at least two individuals, and that Rosario matched the major profile in the DNA mixture.

2. *Motion to suppress evidence.* Before trial, the defendant filed a motion to suppress evidence seized by the police during a search of LaVoice's apartment pursuant to a search warrant.[10] He asserted that the affidavit in support of the warrant did not state the grounds constituting probable cause for the search and did not establish the reliability of the citizen informant. As such, the search violated his statutory and constitutional rights. The motion judge denied the motion to suppress evidence. He concluded that the search warrant was supported by probable cause, and that the information contained in the affidavit did not come from an unknown, anonymous informant but, rather, from a citizen who presented herself to the police and was readily identifiable.[11] Subsequent to the denial of the suppression motion, defense counsel received discovery from the Commonwealth that included a report showing that DNA from the defendant and from Miranda had been found on the red and white sneakers seized from LaVoice's apartment. Nonetheless, defense counsel did not renew or move for reconsideration of his motion to suppress. We turn first to the grounds for probable cause, and then consider the veracity of the citizen informant.

a. *Probable cause to search for sneakers.* The defendant contends that the police lacked probable cause to search for and seize the red and white sneakers. He asserts that the affidavit in support of the warrant application described the robbery and a possible carjacking but did not mention the murders, anyone

---

[10]The warrant authorized a search for "any trace evidence including blood evidence, bodily fluids, DNA evidence, footwear impressions, personal papers and effects of Brian K. Cavitt. Also clothing, cutting instruments, cutting tools, blunt force instruments, and fragments of dust, dirt, and soil."

[11]At the suppression hearing, the prosecutor noted for the record that the search of LaVoice's apartment also had been conducted pursuant to her signed consent form. However, the Commonwealth did not introduce any evidence at the hearing regarding LaVoice's consent, and therefore, we do not consider this matter further.

wearing sneakers, or the discovery of footwear impressions at the scene of a crime. Accordingly, the defendant argues that the search for the sneakers exceeded the scope of the warrant, and that his trial counsel was ineffective for failing to seek suppression on this basis. Further, the defendant continues, his trial attorney also was ineffective because he failed to pursue suppression of the sneakers after he received the DNA report regarding the blood found on them — key evidence that harmed the defendant's case. In the defendant's view, the alleged ineffective assistance of trial counsel created a substantial likelihood of a miscarriage of justice and violated his rights under the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution, and arts. 12 and 14 of the Massachusetts Declaration of Rights. Therefore, the defendant argues, his motion for a new trial should have been allowed. We disagree.

A motion for a new trial is addressed to the sound discretion of the judge. See *Commonwealth* v. *Greineder*, 458 Mass. 207, 245 (2010); *Commonwealth* v. *Watson*, 455 Mass. 246, 256 (2009). "[A]n appellate court will examine the motion judge's conclusion[s] only to determine whether there has been a significant error of law or other abuse of discretion." *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986). We accord substantial deference to a judge's decision on a new trial motion where, as here, that judge also was the trial judge. See *id.* The judge may decide such a motion without holding a hearing "if no substantial issue is raised by the motion or affidavits." Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001). See *Commonwealth* v. *Mercado*, 452 Mass. 662, 672-673 (2008). A motion for a new trial will be allowed "if it appears that justice may not have been done." Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001).

The defendant sought a new trial based on the alleged ineffective assistance of trial counsel. The standard of review under G. L. c. 278, § 33E, for claims of ineffective assistance of counsel is more favorable to a defendant than the Federal or State constitutional standards. See *Commonwealth* v. *Mosher*, 455 Mass. 811, 827 (2010); *Commonwealth* v. *Burke*, 414 Mass. 252, 256 (1993). Under the § 33E standard, "we need not focus on the adequacy of trial counsel's performance. . . . [Rather,] we shall consider whether there was an error in the

course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). To prevail on a claim of ineffective assistance of counsel in regard to a motion to suppress, the defendant must demonstrate that the evidence would have been suppressed if properly challenged, and that counsel's failure to pursue such a challenge created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Banville*, 457 Mass. 530, 534 (2010); *Commonwealth* v. *Williams*, 453 Mass. 203, 207 (2009).

The Fourth Amendment to the Federal Constitution and art. 14 of the Massachusetts Declaration of Rights both require a magistrate "to determine that probable cause exists before issuing a search warrant." *Commonwealth* v. *Byfield*, 413 Mass. 426, 428 (1992). "[P]robable cause requires a 'substantial basis,'" *Commonwealth* v. *Stewart*, 358 Mass. 747, 749 (1971), for concluding that 'the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues.' " *Commonwealth* v. *Kaupp*, 453 Mass. 102, 110 (2009), quoting *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983). Review of the sufficiency of the search warrant application "begins and ends with the 'four corners of the affidavit.' " *Commonwealth* v. *O'Day*, 440 Mass. 296, 297 (2003), quoting *Commonwealth* v. *Villella*, 39 Mass. App. Ct. 426, 428 (1995). In determining whether an affidavit justifies a finding of probable cause, the affidavit is considered as a whole and in a commonsense and realistic fashion; inferences drawn from the affidavit need only be reasonable and possible, not necessary or inescapable. See *Commonwealth* v. *Kaupp*, *supra* at 111.

When the affidavit prepared by Springfield police Officer Anthony Pioggia, III, is read in a commonsense manner, the information contained therein supports a conclusion that there was a nexus between the armed robbery of the Big Y's Western Union office and purported carjacking of Thompson, and the sneakers seized from LaVoice's apartment. The affidavit stated that the police met in person with a female telephone caller

(whose reliability was adequately established, as will be discussed) who identified the defendant from a photographic array and provided information consistent with those two incidents. The woman told the police that the defendant was in her apartment during the late morning and afternoon of May 5, 2006, that he had injuries to his body consistent with having been in a fight, that she heard him say that "he had done something bad," and that the clothing recovered as evidence from the robbery and purported carjacking belonged to the defendant. The affidavit, and an attached narrative authored by Sergeant Kevin Devine requesting an arrest warrant, further stated that Big Y employees had chased the defendant after he fled from the store, that they caught up to the defendant and briefly fought, and that the defendant had punched John Ryan in the face, causing a laceration to his lip. Finally, the affidavit stated that the defendant had tumbled to the ground during his unsuccessful effort to gain entry into Thompson's vehicle while fleeing from the Big Y.

Although the defendant shed some items of clothing during his escape, he remained dressed, and there was a substantial basis for concluding that the clothes that he did not discard, including footwear, would be found at LaVoice's apartment. In light of the altercation between the defendant and Ryan, it was reasonable to infer that trace evidence, including blood, tissue, or fragments of clothing, may have transferred between the men, including onto their shoes, and that such evidence would be relevant to the identification of the defendant as the perpetrator of the armed robbery. Similarly, it was also reasonable to infer that the defendant's clothing, and any scrapes or tears thereto, could provide trace evidence linking the defendant to the purported carjacking of Thompson's vehicle.

Based on our review of the four corners of Pioggia's affidavit, we conclude that it set forth probable cause to search LaVoice's apartment for items of the defendant's clothing, including his red and white sneakers. It follows, therefore, that the seizure of the sneakers did not exceed the scope of the search warrant. Contrary to the defendant's argument, his trial counsel was not ineffective for failing to seek suppression on this basis. Further, in light of our conclusion, the fact that defense counsel

did not renew his motion to suppress or file a motion for reconsideration after Miranda's DNA was found on the defendant's sneakers did not constitute ineffective assistance where the sneakers were properly seized in the first instance. See *Commonwealth* v. *Conceicao*, 388 Mass. 255, 264 (1983) ("It is not ineffective assistance of counsel when trial counsel declines to file a motion with a minimal chance of success"). The subsequent discovery of incriminating evidence did not negate the validity of the original search and seizure. Accordingly, the defendant's motion for a new trial was properly denied.

b. *Veracity of citizen informant.* The defendant contends that the judge erred in denying his motion to suppress evidence because the search warrant affidavit was not supported by probable cause where the veracity of an unknown citizen informant was not adequately demonstrated. The defendant relies on language in the affidavit stating that such individual wished to remain "anonymous" because of safety concerns, and asserts that, contrary to the motion judge's conclusion, the affidavit did not indicate that the citizen informant was "readily identifiable." Further, the defendant continues, even if such individual was identifiable by the police, the information set forth in the affidavit did not establish her veracity, and, therefore, the search warrant should not have issued. In the defendant's view, the denial of his motion to suppress violated his rights under the Fourth and Fourteenth Amendments and art. 14. We disagree.[12]

As a general matter, "[w]hen assessing the reliability of citizens who report apparent violations of the law, we accord more weight to the reliability of those who are identified." *Commonwealth* v. *Costa*, 448 Mass. 510, 515 (2007). See *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. 62, 68 (1997) ("a tip from a private citizen is substantially strengthened when the citizen is identified by name and address"), and cases cited. "The rationale for according more weight to the reliability of identified persons is that they 'do not have the protection from

---

[12]With respect to the information provided by the citizen informant, the defendant has not challenged the "basis of knowledge" prong of our customary analysis. Had such a challenge been raised, it would not have been successful. See *Commonwealth* v. *Alfonso A.*, 438 Mass. 372, 374 (2003) (informant's recent firsthand observation satisfies basis of knowledge prong); *Commonwealth* v. *Alvarado*, 423 Mass. 266, 271 (1996) (same).

the consequences of prevarication that anonymity would afford,' *Commonwealth* v. *Love*, 56 Mass. App. Ct. 229, 234 (2002), quoting *United States* v. *Lopez-Gonzalez*, 916 F.2d 1011, 1014 (5th Cir. 1990), and consequently may be subject to charges of filing false reports and risk retaliation."[13] *Commonwealth* v. *Costa, supra* at 516.

At the same time, we also have stated that "the reliability of citizen informants who are identifiable, but may not have been identified, is deserving of greater consideration than that of truly anonymous sources." *Id.* at 515. See *Commonwealth* v. *Alfonso A.*, 438 Mass. 372, 375 (2003) (informant not "anonymous" where, although not named in affidavit, police knew his "identity" and "whereabouts"); *Commonwealth* v. *Love, supra* at 232-234 (reliability prong satisfied where citizen witness was identifiable, if not identified, when he presented himself to police in person and alighted from vehicle whose registration plate was visible to officer and could potentially be traced). "[I]t is important to recognize that citizens who report criminal activity justifiably may be concerned for their own safety if their identity becomes known to the persons subsequently investigated or arrested, and for this reason may wish to remain anonymous. This circumstance should not stand as an insurmountable impediment to a favorable assessment of their reliability . . . ." *Commonwealth* v. *Costa, supra* at 516. See *Commonwealth* v. *Love, supra* at 233, and cases cited (identification of citizen witness by name and address not invariably required to establish reliability). As observed by Justice Kennedy in *Florida* v. *J.L.*, 529 U.S. 266, 275 (2000) (Kennedy, J., concurring), "a tip might be anonymous in some sense yet have certain other features, either supporting reliability or narrowing the likely class of informants, so that the tip does provide the lawful basis for some police action." See *Commonwealth* v. *Costa, supra.*

The affidavit prepared by Officer Pioggia stated that on May

---

[13]General Laws c. 269, § 13A, provides: "Whoever intentionally and knowingly makes or causes to be made a false report of a crime to police officers shall be punished by a fine of not less than one hundred nor more than five hundred dollars or by imprisonment in a jail or house of correction for not more than one year, or both."

6, 2006, at approximately 4 P.M., "a female called the Detective Bureau" and had a "brief conversation" with Detective Eugene Dean. The affidavit stated that Detective Dean, along with two other detectives, met the female caller in the parking lot of 84 West Street and then transported her to the detective bureau. Due to her fear, the woman wished to remain anonymous. Nonetheless, she identified her apartment at a specific address on Oswego Street in Springfield and stated that she lived there with her young child. This citizen informant placed her anonymity sufficiently at risk such that her reliability was properly accorded greater weight than that of an unknown and truly anonymous source. She presented herself to the police in person; she provided her address, which officers could verify, and she told the detectives about her child. Contrary to the defendant's contention, she was identifiable.

In addition, the affidavit stated that the citizen informant identified the defendant from a photographic array and told detectives that he was in her apartment on Oswego Street. The affidavit stated that she relayed information consistent with the armed robbery of the Big Y and the purported carjacking. Further, she told detectives that the defendant had been in her apartment during the late morning and afternoon of May 5, that he had injuries to his body consistent with having been in a fight, and that she heard him say that "he had done something bad." The affidavit also stated that the citizen informant identified articles of clothing that had been recovered from the robbery and purported carjacking as belonging to the defendant. The information provided by the citizen informant was detailed. See *Commonwealth* v. *Aarhus*, 387 Mass. 735, 744 (1982) (detail of information is factor in over-all assessment of informant's reliability). Further, it was corroborated by police knowledge of the Big Y robbery and the defendant's subsequent escape from the scene. See *Commonwealth* v. *Alfonso A.*, *supra* at 376-377 (police corroboration of detail is strong indicator of reliability). We conclude that, taken as a whole and read in a commonsense manner, the affidavit in support of the search warrant adequately demonstrated the veracity of the citizen informant and thus established probable cause for the issuance of the warrant. The defendant's motion to suppress was properly denied.

3. *Motion to suppress photographic identifications.* Before trial, the defendant filed a motion to suppress a photographic identification made on May 6, 2006, by John Ryan, and a photographic identification made on May 5, 2006, by Antonio Vergara. Ryan had selected the defendant's photograph from an array of eight photographs as the person he had chased from the Big Y following the armed robbery. Vergara viewed a series of photographs on a computer terminal at the detective bureau in an effort to identify the individual he had seen fleeing from the Big Y. After he finished looking through the photographs, Vergara got up and, as he was being led out of the detective bureau, looked over at a computer terminal being viewed by Kavin Thompson, saw a photograph of the defendant which happened to be on the screen, and said, "That looks like the guy that I saw."

In his motion to suppress, the defendant asserted that the identifications were the product of procedures that were unnecessarily suggestive and conducive to irreparable mistaken identification. As a consequence, the defendant further asserted that any subsequent in-court identifications also should be suppressed.[14] The judge denied the motion to suppress. He concluded that the defendant had failed to meet his initial burden of proving by a preponderance of the evidence that the procedures used by the police were unnecessarily suggestive and conducive to mistaken identification. With regard to the identification made by Ryan, the judge stated that the photographic arrays were "very fair," and that nothing about them caused the defendant's photograph to stand out from all of the others. With regard to the identification made by Vergara, the judge stated that, contrary to the defendant's assertion, it was not the result of a one-on-one showup but, rather, was "purely inadvertent."

The defendant now contends that the judge erred in denying his motion to suppress Vergara's identification because it was the result of undue suggestion by the police and, therefore, was unreliable. Such error, the defendant continues, violated his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution and art. 12. Further, because identification was a central issue in the case, the erroneous

---

[14]Vergara was not asked to make an in-court identification.

admission of Vergara's identification did not, in the defendant's view, constitute harmless error.[15]

For a motion to suppress a photographic identification to succeed, "the defendant must show by a preponderance of the evidence that, in light of the totality of the circumstances, the procedures employed were so unnecessarily suggestive and conducive to irreparable misidentification as to deny the defendant due process of law." *Commonwealth* v. *Miles*, 420 Mass. 67, 77 (1995). See *Commonwealth* v. *Watson*, 455 Mass. 246, 250-251 (2009), and cases cited. "The question raised by a motion to suppress identification testimony is not whether the witness might have been mistaken, but whether any possible mistake was the product of improper suggestions by the police." *Id.* at 251. See *Commonwealth* v. *Payne*, 426 Mass. 692, 694 n.3 (1998); *Commonwealth* v. *Paszko*, 391 Mass. 164, 172 (1984). "Where an identification procedure is not impermissibly suggestive, a pretrial identification is admissible without any further showing." *Commonwealth* v. *Watson, supra.* See *Commonwealth* v. *Warren*, 403 Mass. 137, 139 (1988). "Conversely, if a defendant establishes that an identification procedure was unnecessarily suggestive, the prosecution may not offer that particular identification in evidence." *Commonwealth* v. *Watson, supra.* See *Commonwealth* v. *Odware*, 429 Mass. 231, 235 (1999); *Commonwealth* v. *Botelho*, 369 Mass. 860, 866 (1976).

Here, the totality of the circumstances do not show by a preponderance of the evidence that Vergara's identification of the defendant's photograph was the product of unnecessarily suggestive police procedures. As defense counsel acknowledged at the suppression hearing, nothing was said or done by the police to direct Vergara's attention to the computer screen that was being viewed by Thompson. Vergara simply looked around as he exited the detective bureau and observed the defendant's photograph on Thompson's screen. As defense counsel further

---

[15]The defendant has not challenged the denial of his motion to suppress the photographic identification made by John Ryan. Had such a challenge been raised, it would not have been successful. See *Commonwealth* v. *Montez*, 450 Mass. 736, 757 (2008) ("There is no requirement that the defendant's image or person be surrounded by people nearly identical in appearance to his own"); *Commonwealth* v. *Tanso*, 411 Mass. 640, 652, cert. denied, 505 U.S. 1221 (1992).

acknowledged, there was no evidence that Vergara overheard Thompson making any comments with regard to the defendant's photograph, which could have tainted Vergara's identification.[16] Vergara's identification of the defendant's photograph plainly did not occur in circumstances that were unnecessarily suggestive. See *Commonwealth* v. *Walker, ante* 590, 605-606 (2011); *Commonwealth* v. *Payne, supra.*

Contrary to the defendant's assertion, Vergara's observation of the defendant's photograph on the computer screen being viewed by Thompson was not a one-on-one showup identification. It was more akin to a display of a series of photographs, given that Vergara had been viewing thousands of photographs on his own computer screen just minutes before leaving the detective bureau. We have concluded that Vergara's identification of the defendant's photograph was not the product of unnecessarily suggestive police procedures that were conducive to a mistaken identification. Accordingly, the defendant's motion to suppress photographic identifications was properly denied.

4. *Admission of DNA evidence.* The defendant contends that inconclusive DNA evidence relating to the gold necklace found in the victims' apartment was erroneously admitted in evidence without the requisite explanatory statistical support. Such error, he continues, resulted from the ineffective assistance of counsel and created a substantial likelihood of a miscarriage of justice. We disagree.

Matthew Dindinger testified that the DNA profile obtained from the gold necklace was "a mixture of at least two individuals." He further testified as follows: "Edelmira Miranda and Corinne LaVoice are excluded as sources of this DNA mixture. The profile in this DNA mixture yielded inconclusive results for comparison for Brian Keith Cavitt and Milagros Rosario. . . . The results we obtained are very low and sometimes not above our reporting threshold, and there just isn't enough information there to make a conclusion as to inclusion or exclusion." Dindinger added that he could not make a determination "[e]ither way." On cross-examination, Dindinger repeated that he "determined that the profile in the mixture

---

[16]In fact, Thompson did not positively identify the defendant's photograph.

yielded inconclusive results for comparison of Brian Cavitt." In response to a question from defense counsel, "So you can't say whether his DNA is on there for certain, correct?," Dindinger responded, "I can't make any conclusions with respect to Brian Cavitt, no." On redirect examination, Dindinger agreed with the prosecutor that he could neither exclude nor include the defendant based on the limited results from the necklace.

A judge generally is accorded substantial discretion in deciding whether evidence is relevant and, if so, whether it nevertheless should be excluded as more prejudicial than probative. See *Commonwealth* v. *Mathews*, 450 Mass. 858, 872 n.15 (2008) (*Mathews*), quoting *Commonwealth* v. *Talbot*, 444 Mass. 586, 589 n.2 (2005). In this regard, DNA test results are no different from other evidence, and a judge's decision to admit or exclude such evidence will be accorded substantial deference. See *Mathews, supra.* "The concept of relevance has two components: (1) the evidence must have some tendency to prove a particular fact; and (2) that particular fact must be material to an issue in the case." *Harris-Lewis* v. *Mudge*, 60 Mass. App. Ct. 480, 485 (2004), citing P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 4.1.1 (7th ed. 1999).

In *Mathews, supra* at 871, we stated that "the admissibility of DNA test results should be determined on a case-by-case basis." There, the defendant questioned the integrity of the police investigation and the adequacy of the forensic evidence. See *id.* at 866-867, 872. We concluded that, when faced with a challenge to the sufficiency of the Commonwealth's investigation, "the prosecutor is entitled to introduce testimony to demonstrate that [DNA] tests were performed and results (even if inconclusive) were obtained." *Id.* at 872.[17] In such circumstances,

---

[17] In *Commonwealth* v. *Mattei*, 455 Mass. 840, 842 (2010) (*Mattei*), we concluded that expert testimony that DNA tests could not *exclude* the defendant as a potential source of DNA found at the crime scene, absent testimony regarding statistical findings explaining the import of such a result, was likely to confuse and mislead the jury such that the prejudicial effect of the test results substantially outweighed their probative value. Further, because the error in admitting such evidence was prejudicial, a new trial was warranted. See *id.* at 855-857. Our decision in *Mattei* is distinguishable from both *Commonwealth* v. *Mathews*, 450 Mass. 858 (2008), and from the present case because the question before the court in *Mattei* was not whether it was error to admit *inconclusive* DNA test results. See *Mattei, supra* at 853-854.

testimony regarding DNA test results, even those that are in-conclusive, is relevant and probative to establishing the integrity and adequacy of the police investigation. Here, however, the focus of the defendant's case was not on challenging the suf-ficiency of the Commonwealth's investigation.[18] Rather, the focus of the defense was on undermining the eyewitness identification evidence, and on showing that the defendant was the "perfect fall guy" for the individual who actually had com-mitted the crimes, namely his brother. In these circumstances, testimony regarding inconclusive DNA results is not relevant evidence because it does not have a tendency to prove any particular fact that would be material to an issue in the case. Accordingly, the testimony from Dindinger regarding the inconclusive DNA evidence obtained from the gold necklace should not have been admitted. Given that there was no objec-tion from defense counsel, we consider whether the admission of such testimony created a substantial likelihood of a miscar-riage of justice. See *Mathews, supra.*

In *Commonwealth* v. *Nesbitt,* 452 Mass. 236, 253-254 (2008) (*Nesbitt*), we stated that testimony regarding inconclusive DNA evidence was prejudicial where the DNA analyst testified that she "was not able to exclude [the defendant or the victim] as being potential contributors to [a] very low level mixture" of DNA found on a bicycle that had been abandoned one-quarter mile from the crime scene. Such testimony suggested to the jury that the defendant and the victim were linked to the DNA evidence because they could not be "excluded" as potential matches, and that "this link would be more firmly established if only more blood were available for testing." *Id.* at 254. We nonetheless concluded in *Nesbitt* that, in light of a thorough cross-examination and a proper closing argument by the prosecu-tor, "[e]ven if it were error to permit the introduction of testi-mony concerning the inconclusive DNA evidence, its admission did not create a substantial likelihood of a miscarriage of justice . . . ." *Id.*

Unlike the DNA testimony in *Nesbitt,* which was prejudicial, the DNA testimony in the present case was wholly neutral.

[18]Defense counsel did not request an instruction pursuant to *Commonwealth* v. *Bowden,* 379 Mass. 472, 485-486 (1980), and none was given.

Dindinger did not testify that he was unable to exclude the defendant as a potential contributor to the DNA mixture found on the gold necklace. Rather, he testified that "there just [was not] enough information there to make a conclusion as to inclusion or exclusion." Contrary to the defendant's assertion, the testimony from Dindinger neither suggested to the jury that the defendant was in any way linked to the DNA found on the necklace, nor implied that the defendant's DNA would have been found there if more of a sample had been present. Simply put, no conclusions could be drawn from the DNA evidence as to whether the defendant had any connection to the gold necklace. It follows, therefore, that statistical evidence to explain the import of this particular DNA testimony would not come into play.

On cross-examination, defense counsel effectively probed Dindinger's testimony regarding the DNA evidence found on the gold necklace. In addition, the prosecutor in his closing argument stated that "there's not enough DNA on [the necklace] for the lab to tell you anything." As such, the prosecutor did not misuse or misrepresent this evidence. See *Nesbitt, supra* at 255. Wholly apart from Dindinger's testimony pertaining to the inconclusive DNA test results from the necklace, there was testimony from LaVoice that the necklace belonged to her but that the defendant had been wearing it. There was also testimony from Mitchell that the defendant had told Mitchell that he had taken the necklace off while he was in the bathroom of the victims' apartment cleaning himself up. We conclude that the error in admitting the inconclusive DNA evidence relating to the necklace would not have influenced the jury's conclusion, was not sufficient to demonstrate ineffective assistance of counsel, and did not create a substantial likelihood of a miscarriage of justice.

5. *Review under G. L. c. 278, § 33E.* In addition to considering the defendant's specific claims on appeal, we have reviewed the entire record of the case in accordance with G. L. c. 278, § 33E. We see no reason to set aside or reduce the verdicts of murder in the first degree.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*