2015 COA 173

The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Dominic Chee MARKS, Defendant–
Appellant.

Court of Appeals No. 14CA0030

Colorado Court of Appeals,
Div. I.

Announced December 3, 2015

Cynthia H. Coffman, Attorney General, Jillian J. Price, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Law Office of Suzan Trinh Almony, Suzan Trinh Almony, Broomfield, Colorado, for Defendant–Appellant.

Opinion by JUDGE HARRIS

¶ 1 Dominic Chee Marks appeals the judgment of conviction entered after a jury verdict finding him guilty of first degree felony murder, aggravated robbery, and first degree burglary.

¶ 2 Mr. Marks raises two issues on appeal, arguing that the district court committed reversible error when it: (1) admitted certain DNA evidence without accompanying statistical data in violation of CRE 702 and 403 and (2) rejected his alternate suspect jury instruction.

¶ 3 As to the former issue, we agree that the "no conclusion" DNA evidence was improperly admitted; however, we find the evidentiary error harmless. As to the latter issue, we conclude that the district court properly rejected the tendered instruction. Accordingly, we affirm Mr. Marks's convictions.

## I. Background

¶ 4 On January 25, 2011, two armed men forced their way into the home of S.W., a marijuana dealer, in search of money and marijuana. The robbery was interrupted by the arrival of S.W.'s husband and son. As S.W.'s husband struggled with the robber who was carrying a shotgun, the other robber fired his handgun. One of the bullets struck S.W. and killed her. The robbers fled, leaving the shotgun behind. Police recovered the handgun, a holster, and some items of clothing in the adjacent yard.

¶ 5 The next day, a woman contacted police and identified Mr. Marks as one of the perpetrators, but she did not provide enough information for the police to obtain an arrest warrant. The police did not uncover further leads until February 2012, when another woman reported to police that her boyfriend, Edsgar Rocha–Lovatos, had confessed to killing S.W. During a subsequent interview with police, Mr. Rocha–Lovatos alternately told detectives that he had committed the crime with Mr. Marks, who was then his roommate, and that he was not involved but had heard the details of the crime from Mr. Marks. Police arrested Mr. Rocha–Lovatos and Mr. Marks and charged them, as codefendants, with felony murder, aggravated robbery, and burglary.

¶ 6 But by late 2012, the police had identified and interviewed a group of young people who had driven with the robbers to S.W.'s home, and they reported that Mr. Marks had committed the robbery not with Mr. Rocha–Lovatos, but with their friend, Cody Richison. Mr. Richison soon confessed and he, too, identified Mr. Marks as his partner in the robbery.

¶ 7 Mr. Marks first proceeded to trial in April 2013, but the jury could not reach a verdict on any of the counts, and the court declared a mistrial. At the second trial, as it had in the first trial, the prosecution presented testimony from the group of young people who were present, at different times, in the period leading up to the robbery, including the woman who first contacted police about Mr. Marks's involvement in the crime and Mr. Richison. And, the prosecution again presented DNA evidence, some definitive and some inconclusive. For his part, Mr. Marks argued, as he had at the first trial, that he was not involved in the crime and that Mr. Rocha–Lovatos and Mr. Richison had robbed and shot S.W. The second jury convicted Mr. Marks of all charges.

## II. Admission of "Inconclusive" and "No Conclusion" DNA Results Without Accompanying Statistics

¶ 8 Mr. Marks contends that the trial court erred in admitting evidence of "inconclusive"

and "no conclusion" DNA results without evidence of their statistical significance. He argues that the admitted evidence was irrelevant and, even if minimally relevant, its probative value was substantially outweighed by the danger of unfair prejudice. We agree in part, but conclude that the error was harmless.

### A. The DNA Evidence

¶ 9 Deoxyribonucleic acid—DNA—is found in the nucleus of human cells and contains genetic information that determines the physical structure and characteristics of each individual. DNA is made up of twenty-three pairs of chromosomes, which in turn contain thousands of genes. The variations in each gene are known as alleles.

¶ 10 A DNA profile is created by documenting alleles at fifteen specific locations, known as markers or loci, in the DNA chain.[1] The analyst creates a DNA profile from the sample obtained from an item of evidence and then compares that DNA profile to other profiles obtained from known individuals (usually the victim and suspect or suspects). The profiles are compared by looking for allele matches at each of the designated markers. Each match can be accorded statistical significance based on population frequency data compiled by the FBI. The statistics indicate the probability that a randomly selected person, if tested, would have the same DNA profile as that of the sample left at the crime scene. In simple terms, as the number of matching alleles at each marker increases between two samples, "the odds of two people having the same profile become vanishingly small." *State v. Williams*, 574 N.W.2d 293, 297 (Iowa 1998).

¶ 11 The prosecution closed its case with its DNA expert, Susan Berdine. Ms. Berdine created DNA profiles from samples obtained from seven items of evidence recovered from the crime scene—the shotgun, the handgun, a holster, a hat belonging to S.W., a sweatshirt, a pair of gloves, and a T-shirt—as well as two strands of hair found in S.W.'s

---

1. The Denver Crime Laboratory's profile also includes a gender marker.

hand. In most instances, more than one sample was taken from an item of evidence. In almost all cases, the DNA samples were mixed, meaning that more than one person's DNA was present on the item of evidence. Ms. Berdine then compared the DNA profiles derived from those samples to the profiles of Mr. Marks, Mr. Rocha–Lovatos, Mr. Richison, S.W., and S.W.'s husband.

¶ 12 Each of Ms. Berdine's conclusions about the comparisons fell into one of five categories, three of which have commonly understood meanings: (1) the profiles *matched*, meaning that there was an infinitesimal chance that another person's DNA profile would be the same as the profile obtained from the item of evidence; (2) a person was *excluded* as a possible contributor, meaning that he or she could not be the source of the DNA found on the item of evidence; or (3) a person was *included* as a possible contributor, meaning that he or she could be the source of the DNA but a complete match between the two profiles had not been established.

¶ 13 Ms. Berdine provided statistical probabilities for the first and third categories. When she testified that S.W.'s DNA profile matched the profile from the hat found at the crime scene, she gave the jury some statistical context for that conclusion—the chances that a random person might also match the DNA on the hat, Ms. Berdine said, were one in twenty-eight quintillion. When she testified that S.W.'s husband was included as a possible contributor to the DNA sample obtained from the shotgun, she acknowledged that one in six random people would also be considered possible contributors based on their DNA patterns.

¶ 14 Most of the results from the DNA testing, however, were "inconclusive" or "no conclusion." These two categories of results have more complicated meanings.

¶ 15 One common reason for the "inconclusive" results was the difficulty in attributing to any one person the alleles present in a mixed DNA sample. As Ms. Berdine explained, a DNA profile looks like a string of numbers, with two numbers at each marker. In a single-source DNA sample, the analyst can compare the numbers from the profiles at each marker and determine if there is a match. But in a mixed sample, where two or more people have contributed DNA, there are more than two numbers at each marker, and, assuming fairly equal contributions by each person, the numbers could combine in any way. Therefore, a person whose profile contains any combination of those numbers might be a possible contributor; that is, his or her DNA profile numbers might match a sample at a certain marker, but they might not. In those instances, Ms. Berdine characterized the results as "inconclusive."

¶ 16 As for the "no conclusion" category of results, Ms. Berdine explained that in some instances, she would be able to determine whether the person's DNA was present or absent in a sample, but her lab did not have the capability to assign statistical probabilities to the result. In those circumstances, she labeled the result "no conclusion."

¶ 17 Statistical probabilities are not provided (because they are not useful) when a person is *excluded* as a possible contributor.[2] *See* Scientific Working Group on DNA Analysis Methods, *SWGDAM Interpretation Guidelines for Autosomal STR Typing by Forensic DNA Testing Laboratories* 4.4, https://perma.cc/D7GT-R8KF (SWGDAM Guidelines).[3] So, Ms. Berdine could only have meant that, in some instances, she could identify a person as being *included* as a possible contributor, but, because she could not give the odds that other, random people might also be contributors, she would simply say that she had no conclusion. With respect to a sample obtained from the shotgun, Ms. Berdine testified that the profile was suitable for excluding possible contributors (Mr. Rocha–Lovatos and Mr. Richison), and for including a major contributor (S.W.'s husband),

---

2. Once a person has been "excluded" as a possible source of the DNA sample, statistics about how many other people would also be excluded as the possible source are not necessary to help the jury understand the significance of an "excluded" result.

3. The SWGDAM Guidelines, developed in conjunction with the federal DNA advisory board, are national quality assurance standards for DNA analysis. *See* 42 U.S.C. § 14131.

but that it was not suitable "for *including* possible minor contributors with any kind of statistical weight given. So those are ... N–C for no conclusion."

¶ 18 In her DNA comparisons using Mr. Marks's DNA profile, Ms. Berdine reached "no conclusion" on six samples obtained from four different items of evidence—the shotgun, the hooded sweatshirt, the gloves, and the hair in S.W.'s hand.

¶ 19 Mr. Marks's DNA was a match to the DNA samples found on the T-shirt, and he was included (with statistical weight given to the inclusion) as a possible contributor to a sample taken from the hooded sweatshirt. Results were otherwise "inconclusive." [4]

¶ 20 Mr. Marks filed a pretrial motion in limine to exclude evidence of the "inconclusive" and "no conclusion" results. He argued that the evidence was irrelevant, as it did not help the jury determine whether he was a possible source of the DNA obtained from the items of evidence and, without accompanying statistical data, the DNA evidence was confusing and misleading. Mr. Marks suggested that the parties inform the jury that, for certain samples, DNA tests yielded results that were "of no value for interpretation."

¶ 21 The district court denied the motion. In rejecting Mr. Marks's proposed stipulation, it emphasized the unique power of DNA evidence:

> [I]t has been my experience that over the last several years, juries, although they will tell you in voir dire they are able to judge—just judge the case based just on the testimony at trial, it is remarkable how many people think that CSI-type shows are real life, that there is always DNA, and there's always fingerprints, that there are always—that there is always some conclusive forensic evidence. That's just the case.
>
> The People have the right to address that in their case in chief to, as [the prosecutor] said, try to persuade the jury of the thoroughness of their investigation, especially

since the defense is that they have the wrong man.

¶ 22 On appeal, Mr. Marks challenges the district court's admission of the "inconclusive" and "no conclusion" results of the DNA testing.

### B. Standard of Review

¶ 23 We review the district court's decision to admit evidence under the deferential abuse of discretion standard. *People v. Jimenez*, 217 P.3d 841, 866 (Colo.App.2008). We will not overturn the court's exercise of its discretion unless it is manifestly erroneous. *Id.*

### C. Applicable Law and Analysis

¶ 24 The admission of expert testimony about DNA evidence is governed by CRE 702 and 403. *People v. Shreck*, 22 P.3d 68, 77 (Colo.2001). As provided in CRE 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Evidence is admissible under CRE 702 if it is reliable and relevant. *People v. Ramirez*, 155 P.3d 371, 378 (Colo.2007).

#### 1. Relevance

¶ 25 Evidence is relevant if it would be useful to the jury, meaning it would assist the fact finder in either understanding other evidence or in determining a fact in issue. *Lanari v. People*, 827 P.2d 495, 502 (Colo. 1992). "Usefulness thus hinges on whether there is a logical relation between the proffered testimony and the factual issues involved in the case." *Ramirez*, 155 P.3d at 379.

¶ 26 DNA evidence is ordinarily useful to the jury because it tends to make it more or less probable that the defendant is connected to the crime. *See, e.g., People v. Rojas*, 181 P.3d 1216, 1222 (Colo.App.2008) (evidence, accompanied by statistical data,

---

4. A hat belonging to S.W. was tested, but all individuals, other than S.W. and her husband, were excluded as possible contributors to the samples taken from the hat.

showing that victim was a possible minor contributor to DNA sample taken from the defendant's penis was relevant to show that the defendant probably had sex with the victim); *see also People v. Wilson*, 38 Cal.4th 1237, 45 Cal.Rptr.3d 73, 136 P.3d 864, 865 (Cal.2006) ("Obviously, evidence tending to show that defendant's blood was found at the crime scene, and that the victim's blood was on defendant's pants, would be highly probative to whether defendant was the killer."). But here, by her own admission, Ms. Berdine's testimony that certain results were "inconclusive" did not make it more or less probable that Mr. Marks was connected to the robbery and murder of S.W.

¶ 27 Ms. Berdine testified that an "inconclusive" result meant that "a person might be there as a possible contributor or [a person] might be excluded but I cannot even make that determination so the DNA results don't support that a person's DNA is there, and they don't support that [a person's] DNA is not there." She clarified that she was offering no opinion on the inconclusive results and that "the DNA does not support a conclusion either way."

¶ 28 This testimony—if introduced for the purpose of directly implicating Mr. Marks in the crime—does not meet the minimum relevancy standards under CRE 401. Relevant evidence makes some fact more or less likely. Ms. Berdine's testimony, however, did nothing to alter this calculus. Her inconclusive findings provided no information to the jury. After hearing that the DNA test for Mr. Marks was inconclusive, the jury had no additional information with which to determine whether Mr. Marks participated in the crime or was present at the scene. *See Deloney v. State*, 938 N.E.2d 724, 730 (Ind. Ct.App.2010) (testimony that the defendant could not be included or excluded as a source of the DNA sample was "meaningless" and inadmissible under Ind. R. Evid. 401 if not accompanied by statistical data); *Common-*

*wealth v. Cavitt*, 460 Mass. 617, 953 N.E.2d 216, 231 (Mass.2011) ("[T]estimony regarding inconclusive DNA results is not relevant evidence because it does not have a tendency to prove any particular fact that would be material to an issue in the case."); *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757, 771 (Neb. 2015) ("[T]he relevance of DNA evidence depends on whether it tends to include or exclude an individual as the source of a biological sample.").

¶ 29 The "no conclusion" results are also irrelevant as direct evidence against Mr. Marks, but for a slightly different reason. On their face, these results suggested a connection between Mr. Marks and the crime because, as Ms. Berdine testified, in those instances she *did* know that Mr. Marks was included as a possible contributor or match to the DNA sample.[5] What she did not know was how many other people could have been possible contributors. The absence of that information rendered the testimony unhelpful to the jury. As one court has noted, if a combination of alleles is so common that a majority of people in the relevant population could not be excluded, then testimony that the defendant cannot be excluded is weak evidence that he or she is the source. But without knowing that statistical probability, jurors cannot be expected to assess the value of the evidence. *Johnson*, 862 N.W.2d at 772-73.

¶ 30 For this reason, several courts have held that, without statistical probability data, a conclusion that the defendant is "included," or "cannot be excluded,"[6] as a possible match is irrelevant. *See Williams*, 574 N.W.2d at 298 (it was error to admit testimony that the defendant could not be excluded as source of DNA in absence of statistical data); *Commonwealth v. Mattei*, 455 Mass. 840, 920 N.E.2d 845, 855 (Mass.2010) (for the same reason match results are inadmissible without accompanying statistical data, testimony that the defendant cannot be excluded

---

5. We note that "no conclusion"—to mean that a conclusion has been reached but, because accompanying statistical data is not available, the conclusion will not be revealed—is not a DNA typing result recognized by the SWGDAM Guidelines. Nor have we found that typing result described in any case law.

6. "Included as a possible contributor," the term used by Ms. Berdine during her testimony, has the same meaning as the term "cannot be excluded." *See* SWGDAM Guidelines 3.6 (Comparison of DNA Typing Results).

as a *potential* match is inadmissible without statistical evidence); *People v. Coy,* 243 Mich.App. 283, 620 N.W.2d 888, 896–97 (2000) (testimony that the defendant could not be excluded as a potential match to DNA sample irrelevant absent statistical data); *State v. Tester,* 185 Vt. 241, 968 A.2d 895, 906–07 (2009) (same); *see also United States v. Morrow,* 374 F.Supp.2d 51, 65–66 (D.D.C. 2005) (allowing testimony that defendant could not be excluded as source of DNA even though statistical significance was low because the defendant could cross-examine on the statistical relevance of the conclusion).

¶ 31 We are persuaded by the reasoning of these courts, which is in line with case law from Colorado. The supreme court has cautioned that a DNA match result, unaccompanied by its statistical significance, "is essentially meaningless." *Fishback v. People,* 851 P.2d 884, 893 n. 18 (Colo.1993), *abrogated on other grounds by Shreck,* 22 P.3d 68. And, in *Rojas,* a division of this court approved the admission of testimony that the victim could not be excluded as a possible match to a DNA sample taken from the defendant's penis where the statistical data showed that 99.6% of the population could be excluded. Under those circumstances, the court held, the DNA results were helpful to the jury in deciding whether the defendant had had sexual contact with the victim. 181 P.3d at 1222.

¶ 32 Indeed, in arguing for the admission of Ms. Berdine's "inconclusive" and "no conclusion" results, the prosecution conceded that testimony suggesting the defendant could be included as a source of the DNA would be improper without accompanying statistics: "We're not going to have [Ms. Berdine] opine to an opinion with a situation where there is no statistical value if it could be the defendant's DNA because we do agree that would be improper." And yet, that is exactly what Ms. Berdine did—she told the jury that a "no conclusion" result meant that Mr. Marks was included as a possible contributor to the DNA sample but that she could not provide evidence of the statistical significance of those results.

¶ 33 On appeal, as they did in the district court, the People argue that although the "inconclusive" and "no conclusion" results were not useful in determining a fact related to Mr. Marks's connection to the crime, the evidence was nonetheless relevant because it demonstrated the thoroughness of the police investigation. That was necessary, the People say, to rebut Mr. Marks's theory that the police's shoddy investigation led them to arrest the wrong person.

¶ 34 We agree that evidence may be independently relevant to show that police conducted a thorough investigation. *See People v. Harland,* 251 P.3d 515, 517 (Colo.App. 2010); *see also Commonwealth v. Mathews,* 450 Mass. 858, 882 N.E.2d 833, 844–45 (Mass. 2008) (where defense challenged police investigation and its use of forensics, prosecution is entitled to introduce DNA results, even if inconclusive, to show thoroughness of investigation). We do not agree as emphatically that Mr. Marks actually presented a defense the central theme of which was the deficiency of the police investigation, but we will assume that it was part of his theory of defense.

¶ 35 Even so (and even assuming the evidence's maximum probative value), this independent basis for admission increases the probative value of the "inconclusive" and "no conclusion" results from none to minimal. "The probative worth of any particular bit of evidence is affected by the scarcity or abundance of other evidence on the same point." *People v. Saiz,* 32 P.3d 441, 446 (Colo.2001). The prosecution presented lengthy testimony from Ms. Berdine. She explained in detail the process of extracting DNA samples from the items of evidence, creating DNA profiles, and then comparing the profiles to those of the known individuals. She gave definitive results for many of the comparisons to the known individuals' profiles. Under the circumstances, we fail to see much additional benefit from the introduction of the "inconclusive" and "no conclusion" results, as opposed to a more general statement that certain samples did not yield a result of evidentiary significance. *Id.* at 448 (videotape depicting already admitted and uncontested testimony minimally probative as it was only offered for impeachment).

## 2. CRE 403

¶ 36 In any event, even if the evidence has independent relevance, it must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. CRE 403; *Salcedo v. People*, 999 P.2d 833, 838 (Colo.2000). When reviewing a district court's CRE 403 determination, we assume the maximum probative value a reasonable fact finder might give the evidence and the minimum unfair prejudice reasonably expected. *People v. Gibbens*, 905 P.2d 604, 607 (Colo.1995).

¶ 37 We turn first to the evidence of "inconclusive" results. Though the evidence may be only minimally relevant, we discern no prejudice from its admission. An "inconclusive test is evidence of nothing" and "evidence of nothing [is] not prejudicial[ ]." *Clark v. State*, 218 Md.App. 230, 96 A.3d 901, 907 (2014) (citation omitted); *see also United States v. Allen*, 610 Fed.Appx. 773, 777–78 (10th Cir.2015) (government's decision to introduce inconclusive DNA results was "a bit baffling" as the evidence's probative value was "minimal at best," but danger of unfair prejudice was "even more slight"); *Cavitt*, 953 N.E.2d at 232 (evidence of inconclusive results not prejudicial because the testimony was "wholly neutral"). Moreover, Ms. Berdine specifically cautioned the jury against giving any weight to the inconclusive results: "[I]t would be inappropriate to speculate that [Mr. Marks is] there and inappropriate to speculate that he's not there because what we have is DNA evidence that doesn't support either of those conclusions." Accordingly, we conclude that the district court did not abuse its discretion in admitting evidence of the inconclusive DNA results.

¶ 38 But as to evidence of the "no conclusion" results, its minimal probative value was substantially outweighed by a risk of misleading the jury. Ms. Berdine's "no conclusion" testing result meant that she could determine that a person was included as a possible contributor, but that she could not provide "statistical weight" for the result and, therefore, she could not reveal her conclusion. That left the jury with only half the necessary information: that Mr. Marks was

included, or could not be excluded, as a possible contributor to the DNA on various items of evidence.

¶ 39 Without the probability assessment, though, a jury does not know what to make of the fact that a person's DNA pattern is a possible match to the DNA evidence samples; "the jury does not know whether the patterns are as common as pictures with two eyes, or as unique as the Mona Lisa." *United States v. Yee*, 134 F.R.D. 161, 181 (N.D.Ohio 1991), *aff'd sub nom. United States v. Bonds*, 12 F.3d 540 (6th Cir.1993). And, in contrast to the "inconclusive" results, where Ms. Berdine cautioned the jury not to speculate about whether Mr. Marks's DNA might match DNA from the crime scene, her testimony about the "no conclusion" results invited the jury to speculate about the probability of a match. Because "no evidence convey[ed] the likelihood that defendant's DNA could not be excluded as present in the mixed samples, the significant possibility exists that the jury might have attributed the potential DNA match preemptive or undue weight, thus unfairly prejudicing defendant." *Coy*, 620 N.W.2d at 899.

¶ 40 DNA is different from other identifying evidence. If a witness testified that she could not exclude the defendant as a suspect because the defendant, like the suspect, had brown hair, a juror would know to give almost no weight to that testimony. Jurors are presumed to have some knowledge of the frequency of this characteristic within the general population. But because a juror is unable to observe a person's DNA, "the juror has no idea of the frequency of a particular DNA profile." *Mattei*, 920 N.E.2d at 858 (citation omitted). And, "[c]ertainly, a judge's or juror's untutored impression of how unusual a DNA profile is could be very wrong." *Tester*, 968 A.2d at 907 (quoting National Research Council, *The Evaluation of Forensic DNA Evidence* 193 (1996)).

¶ 41 As the district court noted, jurors place great emphasis on DNA evidence—so much so that the evidence has long enjoyed a status of "mythic infallibility" for juries. *Virgin Islands v. Byers*, 941 F.Supp. 513, 526 (D.V.I.1996) (citation omitted). In the ab-

sence of statistics about the probability of DNA patterns, jurors are likely to assume that the probability of a random matching pattern is exceedingly low. *See Mattei*, 920 N.E.2d at 857 (if jury is not provided with statistical evidence, there is a risk that the jury will be misled into believing that the results are more significant than they are).

¶ 42 There was a substantial risk in this case that the jury would have guessed, and miscalculated, the probability that Mr. Marks's DNA was present on the shotgun, the gloves, and the hair in S.W.'s hand. Accordingly, we conclude that the probative value of the "no conclusion" results was substantially outweighed by the risk of unfair prejudice and misleading the jury. The district court therefore abused its discretion in admitting that evidence.

### 3. Harmless Error

¶ 43 Having determined that the district court's admission of the "no conclusion" results was error, we now consider whether the error was harmless. The inquiry under harmless error is not whether there was sufficient evidence to support the verdict without the improperly admitted evidence, but, rather, whether the error substantially influenced the verdict. *People v. Gaffney*, 769 P.2d 1081, 1088 (Colo.1989); *see also Clark*, 96 A.3d at 907 ("[I]n a harmless error analysis, the issue is not what evidence was available to the jury, but rather what evidence the jury, in fact, used to reach its verdict.") (citation omitted).

¶ 44 We conclude that the error was harmless. The "no conclusion" results were presented during testimony that also included Ms. Berdine's conclusions that Mr. Marks was a match to the DNA found on the T-shirt and was included as a possible contributor (with accompanying statistical data) to the DNA obtained from the hooded sweatshirt. Neither side discussed the "no conclusion" results in closing argument or otherwise emphasized the implication of those results.

¶ 45 Nor was DNA evidence the only evidence linking Mr. Marks to the crime. The five young people who testified each identified a person named Dominic as the second robber. Two of the witnesses had identified Mr. Marks from a photo lineup and one provided an in-court identification. Two of them testified that when Mr. Marks started talking about committing a robbery, they parted ways with the group. The witnesses who remained in the car with Mr. Marks and Mr. Richison confirmed that Mr. Marks talked about stealing marijuana from someone and directed the driver of the car to a house where he picked up a shotgun.

¶ 46 Finally, Mr. Richison testified that he planned the robbery with Mr. Marks and that Mr. Marks had fired the shots from the handgun that killed S.W. Though Mr. Richison knew Mr. Rocha–Lovatos from a stint in juvenile detention, the defense did not present any evidence that Mr. Richison would have had a reason to cover for Mr. Rocha–Lovatos by falsely accusing Mr. Marks.

¶ 47 As for an alternate suspect, the evidence did not support much of the defense's theory. For example, the prosecution argued that the second robber had used the T-shirt, which had Mr. Marks's DNA on it, to hide his face during the robbery, consistent with reports from S.W.'s husband and son. Mr. Marks responded that Mr. Rocha–Lovatos had used the T-shirt and that his own DNA was present only because the T-shirt had been mixed in with dirty laundry at the apartment he shared with Mr. Rocha–Lovatos. Mr. Rocha–Lovatos's DNA was not on the T-shirt, though, and Mr. Richison testified that the T-shirt recovered from the scene belonged to him and that he had loaned it to Mr. Marks to use during the robbery.

¶ 48 Though Mr. Rocha–Lovatos gave a detailed confession to police, the confession was not unequivocal—at numerous times during his interview with detectives, he insisted that he had not been involved in the crime. In any event, his confession, if true, established that Mr. Marks was one of the perpetrators.

¶ 49 We acknowledge that Mr. Marks's first trial ended in a hung jury, and that nearly identical evidence was admitted at the second trial. While that may be a factor to consider in evaluating the effect of the error, *see United States v. Street*, 548 F.3d 618, 633

(8th Cir.2008) (considering fact of prior hung jury in harmless error analysis); *Lattimore v. State*, 265 Ga. 102, 454 S.E.2d 474, 478 (Ga.1995) (erroneous jury instruction not harmless where evidence was not overwhelming and two prior juries had failed to reach a verdict), it does not preclude us from concluding that the error was harmless, particularly as the "no conclusion" results were admitted at both trials. *See Moreno v. Borg*, 921 F.2d 280, —— (9th Cir.1990) (unpublished opinion) (error was not harmless where the only significant difference between second trial, at which the defendant was convicted, and first trial, which resulted in a hung jury, was the giving of the erroneous jury instruction). Each jury is a separate fact finder and therefore our determination must be based primarily on whether the verdict delivered by the second jury was substantially influenced by the erroneously admitted "no conclusion" results. In light of the entire record, we conclude that it was not. *See Johnson*, 862 N.W.2d at 774–75 (when viewed in context of overwhelming evidence of guilt, verdict not attributable to speculation about inconclusive DNA results). Accordingly, the error was harmless.

### III. Alternate Suspect Jury Instruction

 ¶ 50 Mr. Marks also contends that the trial court erred in refusing to give his tendered jury instruction regarding evidence that an alternate suspect, Mr. Rocha–Lovatos, committed the crime. We disagree.

¶ 51 At the close of Mr. Marks's first trial, defense counsel tendered the following jury instruction:

> You have heard evidence that Edsgar Rocha L[o]vatos committed the offense with which the defendant is charged. The defendant is not required to prove Edsgar Rocha Lovatos' guilt. It is the prosecution that has the burden of proving the defendant guilty beyond a reasonable doubt. Therefore, the defendant is entitled to an

acquittal if you have a reasonable doubt as to the defendant's guilt. Evidence that Edsgar Rocha L[o]vatos committed the charged offenses may by itself leave you with a reasonable doubt.

> If after considering all of the evidence, including any evidence that another person committed the offense, you have a reasonable doubt that the defendant committed the offense, you must find the defendant not guilty.

After reviewing the tendered instruction, the district court informed Mr. Marks that it would not give the proposed instruction as a regular instruction, but suggested that Mr. Marks revise it as a theory of defense instruction. Mr. Marks declined this offer, indicating that he did not want a theory of defense instruction.

¶ 52 At the close of the second trial, Mr. Marks tendered the same alternate suspect instruction and again declined a theory of defense instruction. The district court rejected the instruction as argumentative.

 ¶ 53 We review the district court's decision to give, or not give, a jury instruction for an abuse of discretion, which occurs when the court's decision is manifestly arbitrary, unreasonable, or unfair. *People v. Omwanda*, 2014 COA 128, ¶ 39, 338 P.3d 1145.[7] Mr. Marks contends that any error should be reviewed under the constitutional harmless error standard while the People argue that harmless error review applies. Because we discern no error, we do not resolve this dispute.

 ¶ 54 The trial court did not err in rejecting Mr. Marks's tendered instruction because he was not entitled to a separate instruction defining the defense, other than a theory of defense instruction. Colorado law recognizes two types of defenses: affirmative defenses and traverses. An affirmative defense admits the conduct charged, but seeks to justify it. A traverse seeks to disprove an element of the crime. *People v. Huckle-*

---

7. The People argue that Mr. Marks waived this issue by declining to revise and resubmit the jury instruction. If Mr. Marks were challenging the district court's failure to give a theory of defense instruction, we agree that the invited error doctrine would bar review of that claim. *See Hansen v. State Farm Mut. Auto. Ins. Co.*, 957 P.2d

1380, 1385 (Colo.1998). But Mr. Marks contends that the district court erred by refusing to give his tendered instruction, which was not offered as a theory of defense instruction, and he preserved that issue by tendering the instruction. *People v. Pahl*, 169 P.3d 169, 183 (Colo.App. 2006).

*berry,* 768 P.2d 1235, 1238 (Colo.1989). Only an affirmative defense requires a separate jury instruction. *People v. Pickering,* 276 P.3d 553, 555 (Colo.2011). Traverses may be explained in a theory of defense instruction, but a defendant is not entitled to a separate instruction on a traverse. *See id.*

¶ 55 Mr. Marks's alternate suspect theory is a traverse; he did not seek to justify the conduct, but rather he contended that the prosecution could not prove his identity, which is an element of every offense. 1 Wayne R. LaFave, *Sub. Crim. L.* § 1.4(b) (2d ed.).

¶ 56 *People v. Huckleberry* is dispositive. In that case, the supreme court affirmed the trial court's rejection of a substantially similar proposed instruction when defense counsel declined to rewrite it as a theory of defense instruction. Although the proffered instruction in *Huckleberry* related to an alibi defense, in substance it was nearly identical to Mr. Marks's proposed instruction. The *Huckleberry* instruction informed the jurors that they had to acquit if they had a reasonable doubt that the defendant was present at the crime, and that it was not the defendant's burden to prove the alibi.[8] The supreme court held that the defendant was not entitled to the instruction because, unlike an affirmative defense, an alibi defense merely "emphasizes the significance of particular issues of fact the People must establish in every criminal case," namely, that the defendant was present at and responsible for the crime. 768 P.2d at 1239.

¶ 57 The same is true of an alternate suspect defense. Mr. Marks's alternate suspect instruction merely highlighted the prosecution's duty to establish that it was actually he, and not a third person, who committed the crime with which he was charged. "No special instructions are necessary to inform the jury of the People's burden to prove that a defendant alleged to have committed an

offense did commit that offense." *Id.*; *see also People v. Nelson,* 2014 COA 165, ¶ 51, 360 P.3d 175 (defendant was not entitled to separate instruction on traverse).

¶ 58 Moreover, a trial court may appropriately refuse to give an instruction which places undue emphasis on a single issue presented by the evidence. *People v. Zapata,* 759 P.2d 754, 755 (Colo.App.1988), *aff'd,* 779 P.2d 1307 (Colo.1989). Mr. Marks's proffered instruction only served to emphasize his evidence of an alternate suspect, and did not otherwise inform the jury of any law not included in other instructions. Therefore, the trial court did not err in refusing to give the tendered alternate suspect instruction. *See id.* (affirming trial court's refusal to give substantive instruction about misidentification defense because tendered instruction was repetitive and unduly emphasized specific evidence).

¶ 59 In any event, Mr. Marks was not prevented from presenting his alternate suspect theory of defense. During trial, Mr. Marks presented evidence that Mr. Rocha–Lovatos was the true perpetrator, including that he initially confessed to the murder and was given a "sweetheart deal" to cooperate. Defense counsel emphasized this evidence during closing argument, arguing at length that Mr. Rocha–Lovatos, and not Mr. Marks, murdered S.W. Accordingly we discern no abuse of discretion in the district court's refusal to give Mr. Marks's tendered instruction.

### IV. Conclusion

¶ 60 The judgment is affirmed.

JUDGE TAUBMAN and JUDGE J. JONES concur.

8. The full instruction read:
 Evidence has been introduced tending to establish an alibi which amounts to a contention that John F. Huckleberry was not present at the time when or at the place where he is alleged to have committed the offense charged. If after consideration of all the evidence in the case you have a reasonable doubt whether the defendant was present at the time and place the alleged offense was committed, you must acquit him.
 The jury will always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witness or producing any evidence.
 *People v. Huckleberry,* 768 P.2d 1235, 1237 (1989).