22CA0038 Peo v McDuffie 04-24-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA0038
City and County of Denver District Court No. 19CR6072
Honorable Jennifer B. Torrington, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Elliott O. McDuffie,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE DUNN
Tow and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 24, 2025

Philip J. Weiser, Attorney General, Austin R. Johnston, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Emily Hessler, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Elliott O. McDuffie, appeals the judgment of conviction entered on jury verdicts finding him guilty of two manslaughter counts.  We affirm.

## I.     Background

¶ 2     Early one morning, McDuffie returned home after working a night shift.  As he walked to his apartment, he saw his neighbors, Jamarian McGhee and Destiny McGhee, standing nearby.[1]  The neighbors' apartment windows had recently been shot with a BB gun.  When McDuffie approached, Destiny told Jamarian that McDuffie was the person who had shot their apartment windows.  Jamarian then approached McDuffie to confront him about the windows.

¶ 3     Jamarian and McDuffie dispute what happened next.  According to Jamarian, he calmly walked up to McDuffie and asked about the windows.  Before Jamarian could finish his question, however, McDuffie pulled out a gun and shot him.  In contrast, McDuffie reported that Jamarian approached him angrily and

---

[1] Because Jamarian and Destiny share the same last name, we refer to them by their first names to avoid confusion, but we intend no disrespect.

began to threaten him.  Jamarian also had one hand concealed in his pocket.  Between Jamarian's threats and concealed hand, McDuffie believed that Jamarian had a gun.  Jamarian then jerked his concealed hand from his pocket as if to pull out a weapon.  Fearing for his life, McDuffie drew his gun and shot Jamarian.

¶ 4     McDuffie fired eight shots in quick succession.  Three shots hit Jamarian; he survived.  But one shot hit Destiny, killing her.

¶ 5     For shooting Jamarian, the prosecution charged McDuffie with attempted first degree murder (after deliberation), attempted first degree murder (extreme indifference), and first degree assault.  And for killing Destiny, the prosecution charged McDuffie with first degree murder (after deliberation) and first degree murder (extreme indifference).

¶ 6     At trial, McDuffie defended on the theory that he acted in self-defense against Jamarian and, in doing so, inadvertently shot and killed Destiny.  The jury heard the competing versions of events directly from Jamarian and McDuffie.  It ultimately acquitted McDuffie of all charges as to Jamarian and all but two lesser included manslaughter counts as to Destiny.  The court merged the

2

two manslaughter counts and sentenced McDuffie to six years in prison.

¶ 7 On appeal, McDuffie contends that the trial court erred by (1) declining to instruct the jury on transferred intent self-defense; (2) instructing the jury on deadly force self-defense for Jamarian, who did not die; and (3) denying his motion in limine, which sought to prevent all parties and witnesses from referring to Jamarian and Destiny as "victims" at trial. McDuffie also argues that these errors cumulatively deprived him of a fair trial. We address each contention in turn and conclude that no reversible error occurred.

## II. Transferred Intent Self-Defense Instruction

¶ 8 McDuffie contends that the trial court erred by refusing to instruct the jury "on the doctrine of transferred intent self-defense."

### A. Additional Background

¶ 9 Portions of the jury instruction conference are not in the record, but as best we can tell, the parties agreed to four self-defense instructions with respect to all the charged and lesser included offenses: (1) deadly force self-defense as an affirmative defense; (2) deadly force self-defense as an element-negating

3

traverse; (3) ordinary force self-defense as an affirmative defense; and (4) ordinary force self-defense as an element-negating traverse.[2]

¶ 10　　In addition to these instructions, McDuffie asked the court to instruct the jury on transferred intent self-defense. To that end, McDuffie proposed the following instruction:

> A person's right to act in self-defense is a natural, essential, and inalienable right protected by the Colorado Constitution.
>
> The defendant was legally authorized to use physical force upon another person without first retreating if: He used that physical force in order to defend himself from what he reasonably believed to be the use or imminent use of unlawful physical force by another person and/or others who he reasonably believed to be acting in concert with that person, and he used a degree of force which he reasonably believed to be necessary for that purpose. The prosecution has the burden to prove, beyond a reasonable doubt, that the defendant's conduct was not legally authorized by this defense.

---

[2] Concerning the crimes charged for Destiny, self-defense was an affirmative defense only to first degree murder (after deliberation) and second degree murder, meaning that the prosecution had the burden to disprove the defense. As to the remaining charges for Destiny, self-defense was an element-negating traverse that the prosecution didn't need to disprove. *See Pearson v. People*, 2022 CO 4, ¶¶ 17-19 (explaining the differences between an affirmative defense and a traverse).

Transferred intent self defense: The doctrine of self-defense is available to insulate one from criminal responsibility for charges where his act, justifiably in self-defense against another person, inadvertently results in the injury or death of an innocent bystander.
For example: If A aims at his attacker B in proper self-defense, but hits C instead, he is not generally guilty of murder or assault of C. Once again, he is only as guilty as to C as he would have been had his aim been accurate enough to have hit B.

¶ 11    Citing his constitutional right to present a defense, and pointing to *People v. Koper*, 2018 COA 137, which recognized transferred intent self-defense, McDuffie argued that the court was required to give the transferred intent instruction because it went "to the core of" his defense theory. The prosecution countered that *Koper* required self-defense instructions "where a third party is killed as a result of intent to kill" a different person. Thus, the prosecution argued that the standard self-defense instructions were sufficient and that a separate transferred intent instruction based on *Koper* wasn't necessary. The court agreed with the prosecution and rejected McDuffie's proposed transferred intent instruction.

¶ 12    Defense counsel then asked the court to let him explain transferred intent to the jury during closing argument — that is, to

specifically relay the "A intending to shoot B but hit C" example taken from *Koper* and described in his rejected instruction. The prosecution did not object. The court agreed to allow defense counsel to present that "hypothetical" to the jury so long as it "[did] not include any reference to the case law that underlies it."

¶ 13　During closing argument, defense counsel thoroughly explained to the jury the concept of transferred intent self-defense and, more specifically, how McDuffie's use of self-defense against Jamarian transferred to and justified his conduct as to Destiny.

### B.　Applicable Law and Standard of Review

¶ 14　Transferred intent self-defense is a legal fiction. *See Koper*, ¶¶ 11-13. Under that concept, "the doctrine of self-defense is available to insulate one from criminal responsibility where his act, justifiably in self-defense, inadvertently results in the injury of an innocent bystander." *Id.* at ¶ 13 (citation omitted).[3]

---

[3] The People don't question *People v. Koper*, 2018 COA 137, or ask us to revisit whether transferred intent self-defense applies, so we don't consider that issue. Yet our supreme court has plainly disapproved of the doctrine of transferred intent in first degree murder "bad-aim" cases. *People v. Jackson*, 2020 CO 75, ¶¶ 2, 16-22. Whether and to what extent that view extends to transferred intent self-defense is an open question.

¶ 15    We review a trial court's decision whether to give a particular jury instruction for an abuse of discretion. *People v. Trujillo*, 2025 COA 22, ¶ 24. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. *Id.*

¶ 16    But we review de novo whether the jury instructions, as a whole, accurately informed the jury of the law. *Id.*

### C.    The Court Didn't Reversibly Err by Rejecting McDuffie's Transferred Intent Instruction

¶ 17    McDuffie says that, by rejecting his proposed transferred intent self-defense instruction, the trial court "effectively deprived" him of "the benefit of the traverse to the charges" related to Destiny.[4] We disagree for a few reasons.

---

[4] As the People point out — and McDuffie doesn't appear to contest — he argues only that the trial court erred by failing to give his transferred intent instruction as a traverse, not that it erred by failing to tender the instruction as an affirmative defense. Thus, we only address whether the court erred by refusing McDuffie's instruction as a traverse.

### 1.    The Instructions Conveyed the Concept of Transferred Intent Self-Defense

¶ 18    For one, the instructions as a whole accurately conveyed the concept of transferred intent self-defense.  The deadly force self-defense traverse instruction stated:

> A person is justified in using deadly physical force upon another person without first retreating in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person if he reasonably believes a lesser degree of force is inadequate, and he has a reasonable ground to believe, and does believe, that he is in imminent danger of being killed or of receiving great bodily harm.

The ordinary force self-defense traverse instruction similarly provided:

> A person is justified in using physical force upon another person without first retreating in order to defend himself from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose.

¶ 19    Despite these instructions, McDuffie maintains that by informing the jury that he was entitled to defend himself against "another person" when "that other person" was using or about to

8

use unlawful force, the traverse instructions didn't allow the jury to conclude that his use of self-defense against Jamarian also applied to Destiny.[5]

¶ 20    But McDuffie's argument ignores the remainder of the traverse instructions. The traverse instructions specified that "[t]he evidence in his case has raised the question of self-defense with respect to" first degree murder (extreme indifference), manslaughter, and criminally negligent homicide — offenses that *only* concerned Destiny. The traverse instructions then stated that, with respect to these offenses, "a person does not act with extreme indifference, recklessness, or criminal negligence if his conduct is legally justified as set forth above" — that is, if McDuffie's use of force against Jamarian was justified.

¶ 21    Thus, read together, these instructions correctly and completely explained transferred intent self-defense as it applied to Destiny: if McDuffie's use of self-defense against Jamarian was justified, then his conduct toward Destiny was not extremely

---

[5] The self-defense portion of McDuffie's proposed transferred intent instruction included similar references to "another person" and "that person" that he now takes issue with.

indifferent, reckless, or criminally negligent. *See People v. Bryant*, 2018 COA 53, ¶ 85 ("If the instructions, taken as a whole, properly instructed the jury on the governing law, there is no error.").

### 2. No Separate Transferred Intent Self-Defense Instruction Was Required

¶ 22 We are equally unpersuaded by McDuffie's contention that *Koper* requires a separate instruction on transferred intent self-defense. While *Koper* adopted the concept of transferred intent self-defense, *Koper*, ¶ 15, it held only that the defendant's transferred intent self-defense theory warranted a self-defense instruction, *see id.* at ¶ 23 (concluding that "the trial court erred in rejecting defendant's jury instructions on self-defense as an affirmative defense"). *Koper* didn't say that the trial court must give a separate transferred intent self-defense instruction. *See id.* at ¶¶ 4-28. That's so even though the defendant in *Koper* asserted transferred intent self-defense as an affirmative defense, *id.* at ¶¶ 5-6, which requires a separate instruction, *see People v. Marks*, 2015 COA 173, ¶ 54.

¶ 23 Pressing on, McDuffie claims that without an express transferred intent instruction, the other instructions were

"confusing," "contradictory," and "internally inconsistent." He says the jury must've understood and followed the "plain language" of the instructions to find that McDuffie was only authorized to use self-defense against Jamarian. This appears to be a rehash of McDuffie's "that other person" argument that we rejected above. To the extent this argument is different, McDuffie doesn't explain how the instructions were confusing, contradictory, or inconsistent. And he directs us to nothing in the record that suggests the jury misunderstood that if McDuffie's use of self-defense against Jamarian was justified, then his conduct as to Destiny was not extremely indifferent, reckless, or criminally negligent. Indeed, the jury asked two questions during deliberations, and neither involved the traverse instructions or McDuffie's use of self-defense.

¶ 24    Finally, McDuffie argues his transferred intent instruction was necessary because the court was required to "tailor instructions to the particular circumstances" to "apprise the jury of the law of self-defense from the *standpoint of the defendant.*" *Idrogo v. People*, 818 P.2d 752, 754 (Colo. 1991) (emphasis added). In *Idrogo*, the defendant requested a self-defense instruction explaining that he had no duty to retreat before using deadly force against his

11

assailant. *Id.* at 753-54. The supreme court held, among other things, that the trial court erred by failing to explicitly instruct the jury on the defendant's no-retreat theory. *Id.* at 754-57. This holding does not support the broad proposition that McDuffie was entitled to the exact self-defense instruction of his choosing. After all, a court doesn't err by rejecting a defendant's proposed instruction — even if legally correct — when the other instructions adequately advise the jury of the law. *See People v. Darbe*, 62 P.3d 1006, 1010 (Colo. App. 2002). As explained, the two traverse instructions adequately informed the jury that if McDuffie's use of self-defense against Jamarian was justified, then his conduct toward Destiny was not extremely indifferent, reckless, or criminally negligent.[6]

### 3. Any Error Regarding the Self-Defense Instructions Was Harmless

¶ 25     Even if we assume the self-defense instructions could have been clearer, any error was harmless because the court instructed

---

[6] McDuffie doesn't contend that the verdicts are inconsistent, and in any event, consistent verdicts aren't necessarily required. *See People v. Frye*, 898 P.2d 559, 571 (Colo. 1995).

the jury using McDuffie's requested theory of the case instruction.

That instruction read:

> The defense contends that [McDuffie] was lawfully defending himself against the imminent use of unlawful force by [Jamarian], when he fired his gun at [Jamarian], and inadvertently struck and killed [Destiny].
>
> [McDuffie] drew his firearm and used it solely for the purpose of preventing an assault by [Jamarian].

In addition, McDuffie thoroughly walked the jury through the doctrine of transferred intent self-defense and why he believed it applied here. As defense counsel explained to the jury:

> Though A intentionally injures B, A is not guilty of murder. Though he injured B, he may be guilty of no crime at all such as when he's privileged to kill or injure B in self-defense.
>
> Now, suppose A shoots B under these circumstances, right -- suppose that somebody is defending themselves legally, take that part for granted. They believe legally, reasonably, in all ways their conduct is perfectly acceptable to defend themselves to shoot at B, and then inadvertently, accidentally they miss and they kill and injure C, an innocent bystander.
>
> . . . A person's intent to defend themselves from a person also transfers to an unintended bystander. Once again, he's only as guilty to C as he would have been had his aim been

accurate enough to hit B.  In effect, A's intent to shoot, intent to defend himself from B transfers to C.

. . . [McDuffie] never intended to shoot [Destiny].  He never pointed the gun at her.  He never knew that she was there, which is why he's not guilty of any of the crimes for [Destiny] as the named victim in this case.

That's what happened.  There was a situation where [McDuffie] had to defend himself from a threat.  And that's what he did and, unfortunately, [Destiny], who did not deserve to die, died.  It's terrible, it's tragic, but she died because [McDuffie] was defending himself legally.

¶ 26     Because the court instructed the jury on self-defense and McDuffie's theory of defense, and because McDuffie explained his transferred intent defense in closing argument, the failure to separately instruct the jury on transferred intent self-defense didn't substantially influence the verdict or affect the fairness of McDuffie's trial.  *See Hagos v. People*, 2012 CO 63, ¶ 12.

¶ 27     That alone makes this case different from the out-of-state cases McDuffie relies on where, without a separate transferred intent instruction, the jury had no ability to acquit the defendant for crimes related to the bystander.  *See, e.g.*, *State v. Greenfield*, 847 S.E.2d 749, 753-57 (N.C. 2020) (concluding the jury could not

acquit without the defendant's transferred intent self-defense instruction because no self-defense instruction was given for convicted charge and general instruction on transferred intent did not inform the jury that self-defense could transfer); *State v. Clifton*, 290 N.E.2d 921, 922-23 (Ohio Ct. App. 1972) (concluding the jury could not acquit without transferred intent instruction). Unlike these cases, the jury here had an avenue to acquit McDuffie on the charges related to Destiny, and it largely did so.

### 4. The Court Wasn't Required to Rework McDuffie's Theory of the Case Instruction

¶ 28 For similar reasons, we reject McDuffie's alternate argument that the court should have incorporated the substance of his proposed transferred intent instruction into his theory of the case instruction. The jury received McDuffie's requested theory of the case instruction, which advised the jury that he "inadvertently struck and killed [Destiny]" while lawfully defending himself against Jamarian. That is, he got the instruction he asked for. On top of that, as outlined already, the court properly instructed the jury on self-defense and permitted McDuffie to thoroughly explain the concept of transferred intent self-defense in closing argument.

¶ 29    Because the court accepted McDuffie's theory of the case instruction and allowed him to fully explain his transferred intent self-defense theory to the jury, the trial court didn't err by not sua sponte incorporating the substance of McDuffie's rejected transferred intent instruction into his theory of the case instruction. *See People v. Dore*, 997 P.2d 1214, 1221-22 (Colo. App. 1999) (concluding the trial court didn't err by rejecting the defendant's theory of the case instruction because the instructions as a whole and defense counsel's closing argument adequately informed the jury of the defendant's theory of the case); *see Nibert v. Geico Cas. Co.*, 2017 COA 23, ¶ 9 (explaining that it's "not error" for a court to reject a party's theory of the case instruction when, among other things, "the court allows the party to otherwise argue its theory of the case").

¶ 30    We therefore conclude that the trial court didn't reversibly err by rejecting McDuffie's transferred intent self-defense instruction.

## III.    Deadly Force Self-Defense Instruction

¶ 31    Next, McDuffie contends that the trial court erred by instructing the jury on deadly force self-defense. More specifically, he argues that because he didn't use deadly force against Jamarian,

the court shouldn't have instructed the jury on deadly force self-defense as to Destiny, even though she died.

¶ 32    McDuffie didn't object to the deadly force self-defense instructions (indeed, he stipulated to them).  We therefore review only for plain error.  *See People v. Martinez*, 2022 COA 111, ¶ 32, *aff'd*, 2024 CO 48.  To be plain, an error must be obvious, meaning it contravenes a clear statutory command, a well-settled legal principle, or Colorado case law.  *People v. Burdette*, 2024 COA 38, ¶ 32.

¶ 33    We aren't aware of any authority — and McDuffie points us to none — concluding that a deadly force self-defense instruction doesn't apply when one victim dies (albeit inadvertently).  Nor does McDuffie explain how the trial court erred by instructing the jury on deadly force self-defense for the charges related to Destiny, who did die.  Without any argument or legal authority explaining why deadly force self-defense doesn't apply when an unintended victim dies, we conclude that the trial court didn't plainly err by instructing the jury on deadly force self-defense.[7]

---

[7] For the offenses concerning Jamarian, who did not die, the court gave two ordinary force self-defense instructions.

## IV. Motion in Limine

¶ 34    McDuffie's final claim is that the trial court erred by denying his motion in limine, which sought to prevent all parties and witnesses from referring to Jamarian and Destiny as "victims" at trial.

### A. Additional Background

¶ 35    Before trial, McDuffie filed a motion in limine requesting the court to prohibit "all parties and trial participants" from referring to Jamarian and Destiny as "victims" at trial. In it, McDuffie argued that the term "victim" presupposed the commission of a crime, was unfairly prejudicial under CRE 403, undermined his self-defense claim, bolstered the prosecution's theory, and violated his due process and fair trial rights.

¶ 36    At the pretrial motions hearing, the prosecution objected, arguing that it *was* "presupposing the commission of a crime by bringing charges against [McDuffie]" and that Jamarian and Destiny "were, in fact, victims of a crime by the definitions of the Colorado Revised Statutes." The prosecution added that it "will not go around trying to inflame the passions of the jury by using the

word ["victim"] haphazardly . . . but it is a word that is perfectly within our lexicon to use as part of our case."

¶ 37    Denying McDuffie's request, the trial court ruled as follows:

> I'll tell you what I think about it. I think it's a trap for a mistrial. Victim is a natural word. Witnesses are going to use it. . . . I'm not going to set up a ruling so that the minute somebody says victim, which will surely happen, that there's a mistrial motion. I won't do it. People need to testify honestly without pressure. They can't be sitting in the witness stand thinking, What is the list of words I can't say today, and looking nervous about it. They're entitled to testify, and I'm not going to cramp that.
>
> . . . .
>
> You know, sometimes it is statutory. It's not improper to call them victims. It doesn't mean [the People] don't have a burden to prove that they're the victims of a crime in this case. I don't expect the People are going to abuse it. If they do, I can call them up. But, no, we're not banning words in this courtroom like that and putting everyone on edge about it and setting up mistrials. I expect everyone to be careful about it, but there's no ban on the word victim in a murder trial.

¶ 38    During trial, several prosecution witnesses referred to Jamarian or Destiny as "victim" during their testimony. The prosecution occasionally asked questions using the word "victim."

Defense counsel also used the word "victim" in a few questions. The court asked one juror question that used the word "victim." During closing arguments, both the prosecution and defense counsel used the word "victim" once.

¶ 39 McDuffie didn't contemporaneously object to the use of the word "victim" during trial, though he preserved his objection through his pretrial motion in limine.

## B. Standard of Review

¶ 40 We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Strickler*, 2022 COA 1, ¶ 21; *see also Palizzi v. City of Brighton*, 228 P.3d 957, 962 (Colo. 2010) (reviewing a court's ruling on an evidentiary motion in limine for an abuse of discretion). A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. *Strickler*, ¶ 21.

¶ 41 To the extent McDuffie alleges a constitutional violation, we review that allegation de novo. *People v. Cuevas*, 2024 COA 84, ¶ 21.

## C. The Court Didn't Abuse its Discretion by Allowing the Parties and Witnesses to Use the Word "Victim"

¶ 42    By allowing the prosecution and witnesses to refer to Jamarian and Destiny as "victims" throughout trial, McDuffie says the trial court violated his due process rights and his presumption of innocence.  In support, he advances several discrete arguments.  None are persuasive.

¶ 43    First, McDuffie points to Colorado's criminal pattern jury instructions, which include the general recommendation that instructions "[a]void using . . . words which can be construed as connoting prejudgment of the evidence (e.g., the term 'victim,' which presupposes the commission of a crime)."  COLJI-Crim. ch. A, miscellaneous cmt. 2 (2024).  But during the pretrial motions hearing, defense counsel specifically clarified that McDuffie's request to prohibit the word "victim" was "not a jury instruction issue" but rather "an issue related to in-trial references."  Nor does the word "victim" appear anywhere in the jury instructions.  So we don't see how the model jury instructions provide much guidance on the trial court's discretionary evidentiary ruling.  *See People v. Salazar*, 2023 COA 102, ¶ 22 (explaining that the model jury

instructions, while helpful for *instructional* issues, are ultimately not binding on courts).

¶ 44 Second, McDuffie cites cases from other jurisdictions where courts have concluded that it is improper to refer to the complaining witness as a "victim" at trial. *See, e.g., Jackson v. State*, 600 A.2d 21, 24 (Del. 1991); *State v. Devey*, 2006 UT App 219, ¶ 17. Colorado, however, has not prohibited the word "victim" at trial. *See People v. Dinapoli*, 2015 COA 9, ¶¶ 29-35 (recognizing that no Colorado case had yet addressed the issue and acknowledging the split in authority among jurisdictions that have addressed it). Thus, nothing prohibited the court from exercising its broad discretion to decline McDuffie's request.

¶ 45 Third, McDuffie broadly asserts violations of his presumption of innocence and, citing CRE 403, unfair prejudice. But considering the handful of references to the word "victim" in the context of the four-day trial with twenty witnesses, we cannot conclude that the use of the word "victim" was unfairly prejudicial, much less that it violated his presumption of innocence. *See People v. Gonzales*, 2019 COA 30, ¶ 34 (noting that unfair prejudice refers to an undue tendency to suggest a decision made on an improper

22

basis), *aff'd*, 2020 CO 71; *see also People v. Pernell*, 2014 COA 157, ¶¶ 69-74 (discerning no error or unfair prejudice from witnesses' and the prosecutor's use of the term "rape" to reference an alleged sexual assault), *aff'd*, 2018 CO 13.

¶ 46 To illustrate, some witnesses (such as first responders and a resident of the apartment complex where the parties lived) referred to Jamarian and Destiny as "victims" because the witnesses didn't know their names. In those instances, the prosecution appeared to try and encourage the witnesses to use Jamarian's and Destiny's names instead of the word "victim." While the prosecution did occasionally ask questions using the word "victim," such questions were asked to elicit information from these witnesses about what happened after the shooting occurred and over the course of the police investigation and were not framed to evoke sympathy or inflame the jury. Other times, the witnesses and prosecution used the word "victim" generically and not in reference to Jamarian and Destiny (for example, to explain how a doctor generally treats gunshot wound victims). And during closing argument, the prosecutor called Jamarian a "victim" once when summarizing

McDuffie's testimony about the shooting. None of these instances strike us as improperly inflammatory or unfairly prejudicial.

¶ 47 Still, even assuming the trial court abused its discretion by allowing the references to Jamarian and Destiny as "victims," we will not reverse unless the court's error "substantially influenced the verdict or affected the fairness of the trial proceedings." *People v. Snelling*, 2022 COA 116M, ¶ 32 (citation omitted). The record here demonstrates that the references to the word "victim" — used relatively sparingly and scattered throughout the trial — neither adversely influenced the jury's verdict nor rendered the trial unfair. That is, despite occasional references to Jamarian as a "victim," the jury acquitted McDuffie of all charges for Jamarian. It likewise acquitted McDuffie of all but two lesser included charges for Destiny. Thus, the verdicts show that the word "victim" did not unduly sway or influence the jury. *See People v. Quillen*, 2023 COA 22M, ¶ 39 (remarking that a split verdict shows that the jurors "parsed the evidence and were not unduly swayed by any improper evidence"); *Snelling*, ¶ 40 (explaining that the jury's split verdict demonstrates that the improper testimony "did not substantially influence the verdict"). The court also mitigated any harm by

properly instructing the jury orally and in writing on McDuffie's theory of self-defense, his presumed innocence, and the prosecution's burden of proof. *Cf. Dinapoli*, ¶ 32 (concluding that references to complaining witness as a "victim" during trial did not cause sufficient prejudice to constitute plain error because jury was instructed on presumption of innocence and burden of proof); *State v. Robinson*, 838 A.2d 243, 247-48 (Conn. App. Ct. 2004) (concluding that any prejudicial effect resulting from trial court's use of the word "victim" in jury instructions was negated, and therefore did not violate the defendant's right to a fair trial, because the jury was also instructed on the defendant's presumption of innocence).

¶ 48   All this said, we conclude that the trial court didn't reversibly err by allowing the parties and witnesses to refer to Jamarian and Destiny as "victims" at trial.

## V.   Cumulative Error

¶ 49   Though we have assumed two possible errors, even viewed collectively, the assumed errors did not "substantially affect[] the fairness of the trial proceedings and the integrity of the fact-finding process." *Howard-Walker v. People*, 2019 CO 69, ¶ 24 (quoting

25

*People v. Lucero*, 615 P.2d 660, 666 (Colo. 1980)).  We therefore reject McDuffie's cumulative error contention.

## VI.   Disposition

¶ 50      We affirm the judgment.

JUDGE TOW and JUDGE MEIRINK concur.